Rafaele L. Demoulas, administratrix,[1] & others[2] *vs.*
Telemachus A. Demoulas & others.[3]

Arthur S. Demoulas *vs.* Demoulas Super
Markets, Inc., & others.[4]

Middlesex. April 3, 2000. - June 30, 2000.

Present: Marshall, C.J., Abrams, Greaney, Ireland, & Spina, JJ.

*Judge. Practice, Civil,* Disqualification of judge, Costs, Transcript of testimony, Judgment, Correction of judgment. *Corporation,* Stock, Valuation of stock. *Bona Fide Purchaser. Gift. Trust,* Constructive trust. *Damages,* Restitution.

In a civil action, defendants' motions for recusal, filed after trial, after judgment, and after appellate review of most issues, were untimely [50-53]; moreover, the allegations supporting the motions were legally insufficient: the judge correctly denied the motions [53-55].

In a civil action, where defendants failed to establish that they were bona fide purchasers for value of their initial interests in a trust, those interests were subject to reformation in favor of the plaintiffs on their claims arising out of a violation of the fiduciary duty owed them [57-60, 63]; and with respect to a distribution of stock to the defendants, who acquired the shares with actual knowledge that the stock was subject to adverse claims by the plaintiffs, a constructive trust was correctly imposed [60-62, 63].

In a civil action, prevailing plaintiffs were not entitled to costs for the expense of daily trial transcripts where no rule or statute allowed such an award. [63-64]

This court declined to consider an issue raised for the first time on appeal. [64-65]

In a civil action in which plaintiffs successfully invoked the court's equitable powers to reclaim ownership of stock which the corporation had improperly redeemed, the judge properly exercised her equitable powers to order the plaintiffs to reimburse the defendants for any tax payments they had made on account of the redemption of that stock. [65-68]

[1]Of the estate of Evan G. Demoulas and as next friend of Vanessa Evan Demoulas.

[2]Diana D. Merriam, Fotene J. Demoulas, Arthur S. Demoulas, and Evanthea Demoulas.

[3]Arthur T. Demoulas; Frances D. Kettenbach; Glorianne D. Farnham; Caren D. Pasquale; and Demoulas Super Markets, Inc.

[4]Valley Properties, Inc.; Market Basket, Inc.; Doric Development Corp.; Lee Drug, Inc.; and Telemachus A. Demoulas, Irene Demoulas, Arthur T. Demoulas, Frances D. Kettenbach, Glorianne D. Farnham, and Caren D. Pasquale, individually and, where applicable, as general partners of 231 Realty Associates.

CIVIL ACTIONS commenced in the Superior Court Department on April 30, 1990..

Following review by this court, 428 Mass. 543 (1998), and 428 Mass. 555 (1998), further proceedings were had before *Maria I. Lopez*, J.

The Supreme Judicial Court granted an application for direct appellate review.

*Robert C. Gerrard* (*Carol R. Cohen* & *Thomas S. Fitzpatrick* with him) for Rafaele L. Demoulas & others.

*Andrea Saunders Barisano* (*Richard K. Donahue* with her) for Telemachus A. Demoulas & others.

*Judith Gail Dein* (*Samuel Adams* & *James J. Arguin* with her) for Glorianne D. Farnham & another.

*Rudolph F. Pierce* (*Jonathan I. Blackman*, of New York, with him) for Arthur T. Demoulas.

GREANEY, J. These appeals, the latest, and hopefully the last, chapter in the Demoulas family litigation, result from proceedings called for in our prior decisions. Those decisions involved (in chronological order) the appeal from the judgments in the shareholder derivative action, *Demoulas* v. *Demoulas Super Mkts., Inc.*, 424 Mass. 501 (1997) (*Demoulas I*); the appeal from an order denying the judge's recusal and a judgment in the same action, *Demoulas* v. *Demoulas Super Mkts., Inc.*, 428 Mass. 543 (1998) (*Demoulas II*); and the appeal from a judgment in the stock transfer action, *Demoulas* v. *Demoulas*, 428 Mass. 555 (1998) (*Demoulas III*). The additional proceedings were decided by the same judge who has been involved in the cases from the outset. The nature of the various disputes are set forth in each decision, which may be consulted for a more thorough history of this considerable litigation. We granted both applications for direct appellate review and consolidated the appeals.

We consider the appeal by the defendants Arthur T. Demoulas (Arthur T.), Glorianne D. Farnham (Glorianne), Caren D. Pasquale (Caren), and Frances D. Kettenbach (Frances) (defendant children), from the judge's orders denying their motions for recusal. We conclude that the motions were properly denied. We consider also the issues arising from the further proceedings ordered in *Demoulas III*, the stock transfer action. Here, we have cross appeals. Specifically, the plaintiffs appeal from a provision of the amended judgment following rescript

(judgment), that allows Telemachus A. Demoulas (Telemachus), and the defendant children, an offset or reimbursement, for taxes they paid (with interest) on shares of the treasury stock of Demoulas Super Markets, Inc. (DSM). The defendant children appeal from determinations that they were not bona fide purchasers either of their initial interests in a real estate trust, Delta & Delta Realty Trust (Delta & Delta), or of certain shares of DSM stock. Telemachus and DSM appeal from (1) that part of the order allowing the plaintiffs' costs for daily trial transcripts; (2) the order denying their motion to revise that portion of the judgment concerning selection of the independent search firm that would name candidates for officer positions at DSM; and (3) the order denying correction of calculation errors in parts of the judgment. We uphold most of the judge's orders, but we conclude that she should not have awarded costs for daily trial transcripts, and that she should have corrected some calculation errors in the judgment.

We first take up the recusal matter. We thereafter decide the cross appeals.

## I. Appeal of the Orders Denying Recusal.

There are two recusal motions in issue, substantively identical and filed on the same day by the defendant children, one motion in each action (the stock transfer action and the shareholder derivative action). The motions sought the judge's recusal, or, at the least, examination of the recusal request at an evidentiary hearing before another judge. The relevant background is as follows.

The present recusal motions are not the first such motions filed in the litigation. Almost six years ago, in 1994, approximately one month before the start of trial in the shareholder derivative action, the defendant children moved, on an "emergency" basis, to recuse the judge. The judge denied their motion. After a lengthy trial, the judge concluded that the defendants were responsible for massive wrongdoing in diverting corporate opportunities. On appeal, the defendants argued that a new trial was necessary on the ground that the judge was biased because she had presided over the jury trial of the stock transfer action, and had, during the shareholder derivative action, made rulings that manifested bias. *Demoulas I, supra* at 524-526. We rejected these arguments.

In June, 1997, new "emergency" motions were filed, in both

the shareholder derivative and the stock transfer actions, to recuse the judge. See *Demoulas II, supra* at 544. The motion in the shareholder derivative action was filed almost two years after the entry of judgment in the case, and just days before a transfer of certain assets was scheduled to occur as required by the judgment. *Id.* In the stock transfer action, the motion to recuse was filed approximately four months after judgment had entered. The motions were substantively identical. Essentially, the defendants alleged that the judge had engaged in improper social contact with lead counsel for the plaintiff in a restaurant owned by the judge's husband. *Id.* at 544-555. They argued that this contact violated Canon 3 of the Code of Judicial Conduct which provides that "[a] judge should disqualify himself in a proceeding in which his impartiality might reasonably be questioned . . . ." *Id.* at 545, quoting S.J.C. Rule 3:09, Canon 3 (C) (1), as appearing in 382 Mass. 811 (1981). The defendants also argued that the allegations warranted a hearing before another judge. *Demoulas II, supra* at 551. We affirmed the judge's denial of the attempt to recuse her. *Id.* at 546-547, 554. See *Demoulas III, supra* at 557 n.4. We stated that, "the denial of the recusal motion was not erroneous considering that it was the second recusal motion coming at the end of complex litigation decided against the moving party, with no substantial justification for its lack of timeliness, where the defendants had some of the information at their disposal for as much as fifteen months, and where the defendants' affidavits taken at face value were insufficient to establish a reasonable basis for questioning the judge's impartiality. In sum the defendants' motion offers too little, too late." *Demoulas II, supra* at 552. We also affirmed the judgment against Telemachus and DSM in the stock transfer action. *Demoulas III, supra* at 591-592. We remanded both the stock transfer and shareholder derivative actions for certain limited proceedings. See *Demoulas II, supra* at 554; *Demoulas III, supra* at 591-592.

During the remand proceedings, the defendant children filed the present motions to recuse. In their memorandum in support of recusal, the defendant children argued that (1) the appearance of impropriety and potential bias of the judge required her recusal; (2) the facts required the judge to refer the matter to another judge for an evidentiary hearing; (3) recusal was required because the judge was directly adverse to Arthur T.; and (4) their motions were timely. The defendant children urged

the judge to consider the cumulative effect of the entire record, including the factual allegations that supported their first and second motions to recuse. The defendant children also presented three allegedly new categories of factual assertions in their third effort to have the judge recused. These categories are as follows.

The first category concerns statements purportedly made by Attorney Paul Walsh, the judge's law clerk during the trial of the shareholder derivative action, to Richard E. LaBonte, a private investigator, and to Attorney Kevin P. Curry. The affidavits of LaBonte and Curry make the following recitals. Curry states that he "was engaged . . . to investigate among other matters, the authorship of the [the judge's decision in the shareholder derivative action]." Curry and LaBonte state that a meeting was held "to determine the role that . . . Walsh played in the drafting of [the decision]." The meeting took place on June 5, 1997, at the Citadel Hotel in Halifax, Nova Scotia. There, Curry and LaBonte interviewed Walsh under the pretext of being potential employers. Curry and LaBonte state that Walsh told them that the judge "was predisposed to find for the [p]laintiff"; that the judge told him (Walsh), before the trial of the shareholder derivative action commenced, that "she knew who 'the bad and the good guys were' and who the winners were going to be before the case beg[a]n"; that "he [Walsh] will easily tell who was lying and that the [p]laintiff's physical evidence will be overwhelming"; and that Walsh "wrote the entire decision, word for word and that [the judge] had simply read it and signed it without any changes." The LaBonte affidavit was signed on June 11, 1997, and the Curry affidavit was signed sometime in June, 1997.

The defendant children also submitted two unsigned statements of Walsh, which describe the circumstances of the Nova Scotia meeting, and the circumstances of two other job "interviews," one in New York, and the other in Boston. According to the statements, Walsh was initially contacted in April, 1997, by one Ernest Reid, who identified himself as a headhunter whose client, a large unidentified Boston law firm with offices in Bermuda, London, and Boston, had seen Walsh's resume and wanted to hire him. After meeting with Walsh twice at Walsh's home and speaking with Walsh over the telephone, Reid arranged to have Walsh interview with his client at the Citadel Hotel in Halifax, Nova Scotia, for an alleged job that

was the "chance of a lifetime," and also have a later interview at the Four Seasons Hotel in New York City. During the interview in Nova Scotia, on June 5, 1997, Walsh met with two men who identified themselves as "Lawrence" and "Concave" (inferably Curry and LaBonte). The men stated that they worked for British Pacific Surplus Risks, Ltd., of London, England, which was involved in catastrophic risk insurance. On June 17, 1997, Walsh met with Lawrence and one Peter O'Hara in New York City. During these interviews, Walsh was asked various questions about the shareholder derivative action, about his involvement in writing the decision in that case, and about the judge. Walsh minimized the judge's involvement in the writing of the decision in the shareholder derivative action, and he made untruthful negative comments about the judge. Walsh did so to show that he could write well and to enhance his chances of being hired.

Walsh's unsigned statements also describe further events, including the circumstances of Walsh's third "interview" at the Four Seasons Hotel in Boston, on August 2, 1997. There, he met with defense attorneys Gary C. Crossen and Richard K. Donahue, as well as O'Hara. O'Hara told Walsh his real name (according to Walsh "Peter Tosh or Nash [something like that]"), stated that he had been hired by the Demoulas family, and that for the next fifteen minutes, Walsh was going to be on the "roller coaster ride" of his life, but that, hopefully, there would be a good outcome if he cooperated with them. The men told Walsh that he was not their target, and that they simply wanted him to tell them things about the judge. They told him that his "interviews" in Nova Scotia and New York had been secretly tape recorded because it was legal to do so in those locations. They informed Walsh that, if he did not speak with them, the circumstances surrounding a purported falsified bar recommendation letter of Walsh would be made public. They further suggested that Walsh's career would be ruined. Donahue and Crossen provided Walsh with their business cards. They advised Walsh to think the matter over and call them.

Last, the defendant children submitted the affidavit of Attorney Richard E. Flamm, the author of the treatise Judicial Disqualification: Recusal and Disqualification of Judges (1996), and an expert in the field of legal and judicial ethics. In his affidavit, Flamm stated his opinion that, "if a reasonable person was made aware of all the relevant facts and circumstances, he

or she would find that [the judge's] impartiality might reasonably be questioned." He also stated that, because the recusal motion was based on the judge's actual bias, the motion could not be denied on timeliness grounds.

The second category of factual assertions serving as a new basis for recusal allege that the judge is directly adverse to Arthur T. The defendant children maintain that this adversity stems from a criminal investigation being conducted by the United States Department of Justice regarding the "interviews" of Walsh; the threat of a civil suit by Walsh; the fact that the judge, Walsh, Crossen, and Donahue will likely be witnesses in any criminal or civil actions; Arthur T.'s filing of a complaint against the judge with the Judicial Conduct Commission (JCC); and the fact that the judge retained counsel to represent her in connection with the JCC matter. The defendant children provided no affidavits to support any of these allegations.

The third category of factual assertions serving as a new basis for recusal concerned the circumstances under which one Bobby Paolucci visited Arthur T. at DSM headquarters on March 22, 1999. In his affidavit, Arthur T. stated that during this visit it became apparent to him that Paolucci was confusing him (Arthur T.) with Arthur S., the plaintiff in the shareholder derivative action, and that Paolucci believed that Arthur S. had taken over the company. Arthur T. stated that Paolucci told him that: a few years ago, at "the meeting at Gerrard's [the plaintiffs' attorney's] office," Arthur S. had indicated that, when he took over the company, Paolucci should come to visit, and Arthur S. would "take care" of him; "he was not there to extort" Arthur S., but was there because of what Arthur S. had previously told him, and he had picked the winning side; he "was clean, could take a check and wasn't one of those people who needed to take cash and would accept some job with the company checking to make sure that the shelves were full"; and he had done a lot for Arthur S. and could have ended up dead. Attached to Arthur T.'s affidavit is a copy of an envelope and enclosed letter that Paolucci supposedly gave to Arthur T. during the visit in case Arthur S. had not been available. The letter is addressed to "Arthur S. Demoulas personal," and is signed "Bob Paolucci." The letter included the following statements: "I remember your words clearly, 'stick by me and when it's all over, just come and see me at my office.' We waited and wanted you to settle in and take charge of your business first . . . . Arthur, it will only

be me you will be talking to . . . ." Other affidavits and materials were also provided that corroborated Paolucci's visit and further contacts with Arthur T.

The judge denied the defendant children's motions to recuse without a hearing. Her order states that she applied the appropriate test governing a recusal request.

A. We decline to revisit the allegations that supported the first and second motions to recuse. The issues relative to those allegations have previously been considered, and they have been decided adversely to the defendants at both the trial and the appellate level. See *Demoulas III, supra* at 557 n.4; *Demoulas II, supra* at 524-526; *Demoulas I, supra* at 524-526.

B. In *Demoulas II, supra* at 547, in analyzing whether the judge properly denied the defendants' second motions for recusal, we examined both the timeliness of the motions and the sufficiency of the supporting allegations. Our consideration of these two factors comports with the procedures followed by other courts. See, e.g., *Huff* v. *Standard Life Ins. Co.,* 643 F. Supp. 705, 707 (S.D. Fla. 1986); *United States* v. *Hall,* 424 F. Supp. 508, 534-535 (W.D. Okla. 1975); *State ex rel. Wesolich* v. *Goeke,* 794 S.W.2d 692, 699 (Mo. Ct. App. 1990). In examining these factors in relation to the motions before us, we conclude that the motions were untimely, and the allegations supporting them legally insufficient. Each of these conclusions, and certainly both taken together, warranted the judge in denying the motions.

1. *Timeliness.*

In *Demoulas II,* we explained the timeliness requirement of motions to recuse, stating that "recusal motions filed after trial are presumptively untimely at least absent a showing of good cause for tardiness." *Id.* at 547. We also emphasized that the defendants had the burden "to make a strong showing that nothing could have been done at an earlier time." *Id.* at 548. We concluded that, with respect to the defendants' second motions for recusal, they had "failed to demonstrate that the filing of this motion was not a last-minute attempt to nullify an adverse judgment." *Id.* at 550.

The defendant children concede that their "present recusal motion [*sic*] was made very late in the game." This is an understatement. The motions were filed long after the trials in both actions had concluded, long after judgments had been entered, and well after we had affirmed the bulk of those judg-

ments. In addition, many of the events on which the motions are based occurred prior to the date (May 3, 1999) on which the defendant children filed their motions. The Nova Scotia "interview" of Walsh occurred on June 5, 1997, about twenty-two days prior to the defendants' second motion to recuse, and almost two years before the defendant children filed the instant motions to recuse. Curry and LaBonte each signed their respective affidavits in June, 1997. Paolucci's visit to Arthur T. occurred on March 22, 1999. Further, the events that the defendant children claim render the judge directly adverse to Arthur T. either have not yet occurred, such as the commencement of any criminal action or civil action, or have already passed, such as the dismissal by the JCC of Arthur T.'s complaint against the judge.

The defendant children seek to excuse their manifestly inordinate delay by suggesting that defense counsel had a duty to investigate the facts before filing the motions. They also contend that the facts establishing the basis for recusal "were not readily apparent, but had to be uncovered outside the courtroom, and then, to the extent possible, corroborated before a recusal motion could responsibly be made." With respect to the Curry and LaBonte affidavits, in particular, the defendant children state that they did not have adequate corroboration until Walsh met with Crossen and Donahue on August 2, 1997, and until Walsh's attorney released Walsh's unsigned statements at a press conference in September, 1997.

The defendant children have failed to make the necessary "strong showing" why they did not come forward with this "evidence" during the time frame following the press conference in September, 1997, and prior to May 3, 1999, and especially prior to October 22, 1997, when they filed their notice of appeal of the second amended judgment in the stock transfer action. They submit no affidavits concerning the details of the "investigation" or "investigations" they allegedly conducted.

The defendant children argue that Paolucci's visit to Arthur T. is significant because it corroborated an earlier report that Arthur S. had promised to "take care of" Paolucci for unknown services he had rendered to Arthur S., and corroborated that Arthur S.'s payment to Paolucci was safe because Arthur S. had the judge in his "back pocket." The defendant children concede that the "evidence" about Paolucci had been available as early as March 2, 1998. Yet, the defendant children sat on the

information for over a month during the remand proceedings. Their counsel attempt to justify the delay by suggesting that "they did not seek to interrupt the briefing schedule for the motions for summary judgment." This excuse undermines the judicial process as it permits valuable judicial resources to be expended perhaps unnecessarily, see *United States* v. *York,* 888 F.2d 1050, 1053-1054 (5th Cir. 1989), and bespeaks a wait-and-see approach characteristic of "sandbagging." See *In re Petit,* 204 B.R. 271, 274 (Bankr. D. Me. 1997). We reject this explanation as an adequate justification for their tardiness in filing the motions.[5]

On the issue of timeliness, we again emphasize what was stated in *Demoulas II:* parties seeking disqualification of a judge, particularly when they move for recusal after there has been a trial, have an obligation to move at the earliest possible opportunity after learning of the grounds for the judge's recusal. See *id.* at 548-549. As officers of the court, attorneys have an affirmative ethical duty not to "pocket" recusal information seeking disclosure at a time that betters serves their litigation strategy.[6] See *Union Carbide Corp.* v. *U.S. Cutting Serv., Inc.,*

---

[5]Counsel's improper labeling of their recusal motions as "emergency" motions further suggests a "sandbagging" tactic. Emergency motions under Superior Court Rule 9A (e) (1) may be directly filed with the court unlike other motions (not otherwise excepted), which must be served on opposing counsel prior to filing in accordance with Superior Court Rule 9A (b). Essentially, all of the defendants' recusal motions have been labeled "emergency" motions.

[6]We reject the defendant children's argument that they could not, by failing timely to file their motions, effectively waive the recusal issue. Unlike the mandatory language appearing in the Federal disqualification statute, see 28 U.S.C. § 455(b)(1) (1994), our Code of Judicial Conduct provides that a judge "should" disqualify herself where she "has a personal bias or prejudice concerning a party," see S.J.C. Rule 3:09, Canon 3 (C) (1) (a), as appearing in 382 Mass. 811 (1981). Further, in spite of the mandatory language in 28 U.S.C. § 455(b)(1), most of the Federal Circuit Courts of Appeals have imposed some timeliness requirement under both subsections (a) and (b) of § 455. See *United States* v. *York,* 888 F.2d 1050, 1054 n.6 (5th Cir. 1989). The waiver contemplated in conjunction with § 455(b) is distinct from timeliness. *Id.* at 1054-1055. "The proscription against waiver in section 455(e) prohibits the parties from agreeing to relinquish their right to have the judge recuse himself if that recusal should be based upon section 455(b) grounds; in other words, section 455(e) prohibits the judge and the parties from agreeing among themselves to abrogate section 455(b). . . . A timeliness requirement forces the parties to raise the disqualification issue at a reasonable time in the

782 F.2d 710, 718 (7th Cir. 1986) (Flaum, J., concurring in part and dissenting in part).

2. *Sufficiency of allegations.*

The lack of timeliness of the motions makes them seriously suspect and by itself may warrant their denial. In an excess of caution, we nonetheless look at the legal sufficiency of the new assertions in the motions.[7] See, e.g., *Hodgson* v. *Liquor Salesmen's Union Local No. 2,* 444 F.2d 1344, 1348 (2d Cir. 1971); *People* v. *Vecchio,* 819 P.2d 533, 535 (Colo. Ct. App. 1991); *State* v. *Mata,* 71 Haw. 319, 325 (1990). "To be sufficient the affidavit[s] must set forth facts, including the time, place, persons and circumstances, and, where based upon an extra-judicial statement of the judge, the substance of that statement." *Hodgson* v. *Liquor Salesmen's Union Local No. 2, supra.* The factual assertions "must not . . . be mere conclusions, opinions, or rumors." *United States* v. *Balistrieri,* 779 F.2d 1191, 1199 (7th Cir. 1985), cert. denied sub nom. *DiSalvo* v. *United States,* 475 U.S. 1095 (1986). The sufficiency requirement is essential because it would be "untenable to require judges to recuse themselves whenever even an unsupported allegation of bias is made. One would be hard pressed to find a judge that would completely satisfy all litigants and such a system would undoubtedly promote the undesirable problem of judge shopping." *Ortiz* v. *City of New York,* 136 Misc. 2d. 500, 502 (N.Y. Sup. Ct. 1987). In addition, "the judge has a duty not to permit the use of an affidavit of bias or prejudice as a means to accomplish delay or to disrupt or defeat the orderly administration of justice." *United States* v. *Hall, supra* at 535.

a. *Statements attributed to Walsh.* The information in the Curry and LaBonte affidavits is hearsay. "An affidavit in sup-

litigation. It prohibits knowing concealment of an ethical issue for strategic purposes." *Id.* at 1055.

[7]The defendant children argue that the allegations in the materials submitted to support the recusal motions must be accepted as true. In *Demoulas II,* for the purposes of our analysis, we assumed that the assertions in the affidavits supporting the recusal motions were true. See *Demoulas II, supra* at 551. Nonetheless, before evaluating the merits of assertions in materials supporting a recusal motion, the judge (or the reviewing court) has to determine the legal sufficiency of the information. If the information is based on inadmissible materials, or is otherwise legally insufficient, it does not have to be accepted. Were this not the rule, judges would be required to recuse themselves based on legally unsupported allegations, a situation that would declare a virtual "open season" for recusal. See *United States* v. *Greenough,* 782 F.2d 1556, 1558 (11th Cir. 1986).

port of a motion to disqualify a judge is generally insufficient when it is supported merely by hearsay." *Farman* v. *State*, 841 P.2d 99, 102 (Wyo. 1992). See *Hodgson* v. *Liquor Salesmen's Union Local No. 2*, *supra* at 1349; *Roussel* v. *Tidelands Capital Corp.*, 438 F. Supp. 684, 690 (N.D. Ala. 1977); *Brown* v. *American Fin. Co.*, 432 S.W.2d 564, 567-568 (Tex. Civ. App. 1968). "If a naked allegation made on the basis of hearsay were sufficient, any party could reject a judge at will." *Farman* v. *State*, *supra*. The defendant children do not contend that any hearsay exceptions apply. They assert, however, that the two unsigned statements of Walsh serve as corroborating evidence of the Curry and LaBonte affidavits. We reject this argument. We disregard Walsh's statements because they are not in affidavit form. We further note that the defendant children concede that a transcript of the "interview" of Walsh in New York exists, but the parties dispute whether a transcript of the "interview" in Nova Scotia exists. The defendant children have not provided a copy of any transcript or transcripts, or, for that matter, the actual tapes of the "interviews."[8] Nor have the defendant children otherwise provided us with any indicia of reliability concerning the judge's purported statements to Walsh. We conclude that the Curry and LaBonte affidavits are legally insufficient.

The Flamm affidavit does not materially aid the case for recusal. The affidavit states opinions based on hearsay documents. Further, remarkably absent from Flamm's affidavit, yet present in his treatise on judicial disqualification, is the following statement: "A conclusory assertion of opinion is not usually deemed to be legally sufficient to warrant judicial disqualification, even when such an opinion is held by many or where the holder of such an opinion is alleged to be an 'expert.' Opinions from 'experts' on issues of judicial disqualification may be considered irrelevant where their views on how a disqualification motion should be decided have not been solicited by the challenged judge." Flamm, Judicial Disqualification: Recusal and Disqualification of Judges, *supra* at 570-571.

---

[8] During oral argument and in a postargument letter, counsel for the defendant children represented that the "a transcript [of the New York 'interview'] was turned over to the U.S. Attorney." Although counsel was also asked during oral argument about the existence or location of any copies of any transcripts, he notably failed to inform this court whether any of his clients, anyone in his law firm, or any predecessor counsel for his clients possess any copies of any transcripts.

b. *Allegations that the judge is adverse to Arthur T.* The defendant children maintain that the judge is in fact adverse to Arthur T. The defendant children's allegations are completely unsupported. See *In re WHET, Inc.,* 33 B.R. 424, 432 (Bankr. D. Mass. 1983). There are no pending proceedings that might require the judge to testify against Arthur T. There is no criminal or civil proceeding commenced with respect to any of the circumstances involving Walsh. Finally, it has not been shown that the filing of a complaint with the JCC by Arthur T. against the judge caused the judge to be biased or prejudiced against him. See *id.* at 425-426; *id.* at 433, quoting *United States* v. *Grismore,* 564 F.2d 929, 933 (10th Cir. 1977) ("a judge is not disqualified merely because a litigant sues or threatens to sue him").

c. *Paolucci's visit to Arthur T.* The defendant children maintain that the information of Paolucci's visit to Arthur T. is significant because it corroborated an earlier report that Arthur S. had not only promised to "take care of" Paolucci for unknown services Paolucci rendered to Arthur S., but also corroborated that Arthur S.'s payment to Paolucci was safe because Arthur S. had the judge in his "back pocket." This information, as the defendant children concede, does not implicate the judge. Further, none of the information of Paolucci's visit to Arthur T. corroborates the multiple hearsay statement made by the defendant children's investigator, Joseph E. McCain, at his deposition that he (McCain) was told by one Joseph Cuticchia that Arthur S. told him (Cuticchia) that he (Arthur S.) had the judge in his (Arthur S.'s) back pocket. The Paolucci information is of no significance.

In summary, the renewed recusal motions are both untimely and lacking in substance because their claims are couched in speculative, equivocal, and vituperative terms. The motions were properly denied.

## II. Appeal of the Defendant Children.

We next take up the defendant children's appeal in the stock transfer action. They challenge the judge's conclusions, after remand proceedings, that they were neither bona fide purchasers of certain shares of DSM stock, nor bona fide purchasers of their initial interests in Delta & Delta. The relevant background is as follows.

In *Demoulas III,* we addressed the defendant children's argu-

ments that the judge had erred in imposing a constructive trust on 400 shares of DSM stock they owned,[9] and in reforming Delta & Delta, a real estate trust formed by their father, to divest them of some of their ownership, as a result of the jury's findings that their father had committed significant wrongdoings. *Demoulas III, supra* at 572-579. We explained that these remedies could be imposed on the defendant children's assets unless they were able to claim the status of bona fide purchasers. *Id.* at 572, 582-583. Under the Uniform Commercial Code (Code), a "bona fide purchaser" is defined as "a purchaser for value in good faith and without notice of any adverse claim." G. L. c. 106, § 8-302 (1).[10] "[A]t common law, a bona fide purchaser defense is also available to transferees of property outside of art. 8." *Demoulas III, supra* at 581-582. In *Demoulas III*, we concluded, with regard to the DSM stock, that the judge erred in determining, as matter of law, that the defendant children were not bona fide purchasers of the stock, and, with regard to the Delta & Delta interests, that the judge should not have reformed Delta & Delta without inquiring whether the defendant children had been bona fide purchasers of their interests. *Id.* at 573, 582. We vacated those portions of the judgment, and remanded the case for "further proceedings . . . on the question whether the children are bona fide purchasers of the stock and their respective interests in Delta & Delta, after which an appropriate supplemental judgment is to be entered." *Id.* at 591.

Thereafter, the judge ordered the parties to file cross motions for summary judgment on these issues. Both sides moved for summary judgment on both issues. The judge entered a written memorandum of decision and order which (1) concluded that the defendant children were not bona fide purchasers of their initial interests in Delta & Delta; (2) reformed Delta & Delta; (3) ordered Telemachus, as the wrongdoer, to transfer his remaining 347 shares of DSM stock, thereby completing divesting himself of DSM stock, to the Evanthea Demoulas Trust and

---

[9]Each of the four defendant children had acquired one hundred shares of DSM stock. *Demoulas III, supra* at 570 n.13.

[10]Confronted with no dispute on the issue, we again apply the 1983 version of the Uniform Commercial Code (Code). See *Demoulas III, supra* at 573 n.14.

the George A. Demoulas Trust[11]; (4) denied the parties' cross motions as they pertained to the issue whether the defendant children were bona fide purchasers of their 400 shares of DSM stock; and (5) ordered an evidentiary hearing with respect to the DSM stock transfers.

After the evidentiary hearing, at which the defendant children testified,[12] the judge entered her findings of fact, rulings of law, and order, concluding that the defendant children were not bona fide purchasers of their DSM stock, and imposing a constructive trust on fifty-three shares of their stock, which was allocated as follows: thirteen shares each from Arthur T., Glorianne, and Caren; and fourteen shares from Frances.

A. *The Defendant Children's Initial Interests in Delta & Delta.*

The undisputed facts before the judge were as follows. Delta & Delta was formed as a real estate trust on August 18, 1971, shortly after the death of George A. Demoulas. Telemachus, George's brother, was the sole trustee. The initial beneficiaries of the trust and their respective interests were as follows: Telemachus 10%; his wife, Irene, 10%; the defendant children, Arthur T. 15%; Glorianne 5%; Caren 5%; Frances 5%; Evanthea, George's wife, 10%; the children of George and Evanthea, Arthur S. 10%; Evan 10%; Diana 5%; Fotene 5%; and Telemachus's brother-in-law, Costas Psoinos, 10%. Telemachus and his family owned a 50% interest, George's family owned a 40% interest, and Psoinos owned a 10% interest. Prior to the formation of this trust, all Demoulas entities had been owned in equal proportions by the two sides of the family, George's side and Telemachus's side, respectively. In October, 1972, Telemachus made a $1,000 capital contribution to Delta & Delta. On January 2, 1973, each of George's and each of Telemachus's children made a $4,000 capital contribution. Also on that date, Telemachus contributed $18,000. At trial, the jury found that Telemachus had violated his fiduciary duty to Evanthea by forming Delta & Delta.

The defendant children take issue with the judge's conclusion that they were not bona fide purchasers of their initial ownership interests in Delta & Delta. In reaching this conclusion, the

[11]This action was suggested by the plaintiffs and agreed to by the defendants.

[12]Telemachus, due to illness, was not available to testify.

judge stated: "The undisputed terms and timing of the transaction . . . establish as a matter of law that the interests [that the defendant children] received in 1971 were a gift. Each Demoulas child, both plaintiff and defendant, contributed the same $4000, yet Arthur T. received a 15% interest, Arthur S. and Evan received a 10% interest each, and each daughter received a 5% interest. Additionally, Telemachus contributed a total of $19,000 and received a 10% interest. The total lack of correlation between the value of the contribution and the percentage of interest received, as well as the significant lapse in time between 1971, when the Delta & Delta interests were received, and 1973, when the Demoulas children made their capital contributions, indicate that the children received their initial interests by gift. . . . The defendant children are, therefore, not bona fide purchasers."

Specifically, the defendant children contend that the fact that they did not receive equal percentages of ownership in Delta & Delta in exchange for their respective capital contributions made on January 2, 1973, does not negate the fact that they each paid value for those interests. They also maintain that value does not have to be given at the time of the transaction for a transferee to qualify as a bona fide purchaser. Further, the defendant children assert that the judge's finding that they received their initial interests in Delta & Delta as gifts is "fundamentally at odds with the record evidence and the jury's verdict, and must be set aside." We need not address these arguments, however, because we conclude that the defendant children failed to satisfy their burden of proof on the essential element that they were purchasers for value.

In support of their contention that they undisputedly gave value in exchange for their original ownership interests in Delta & Delta, the defendant children relied on a document attached as an exhibit to the affidavit of William Maye, the president of Sullivan Bille P.C. (Sullivan Bille), Delta & Delta's accounting firm. This document, which was prepared by an unidentified accountant of Sullivan Bille, lists the January 2, 1973, payments of $4,000 by each of the defendant children, and contains the following statement: "The original capital contribution was to be $4,000 per partner. [Telemachus] made a payment in Oct., 1972 of $1,000 leaving us $43,000 receivable from the other partners." The defendant children also relied on several other Sullivan Bille documents, which reflect that, on December 31, 1972, pro rata receivables for each of the defendant children

were placed on Delta & Delta's books, and later were reversed after the defendant children made their capital contributions on January 2, 1973.

The defendant children, who claimed the status of bona fide purchasers, bore "the burden of persuasion on the issue." *Demoulas III, supra* at 575. We previously explained that "[a] person gives '[v]alue' for rights if he acquires them 'in return for any consideration sufficient to support a simple contract.' " *Demoulas I, supra* at 547, quoting G. L. c. 106, § 1-201 (44) (*d*). While value may be rendered subsequent to the transfer of property, see Restatement (Second) of Trusts § 300 (1959), the transferee's value must be in consideration for the transfer. See *id.* at comment a. See also Restatement of Restitution § 173 comment b (1937). At best, the materials submitted by the defendant children, even if admissible, demonstrate only that they made certain capital contributions on January 2, 1973, and that certain receivables were reversed thereafter. The materials are silent as to whether those capital contributions were made in consideration for the defendant children's initial interests in Delta & Delta.

We reject the defendant children's argument that their capital contributions "could only have been in exchange for their original interests" due to the unsupported allegation that they received no additional interests in Delta & Delta when they made their contributions. We need not consider such an inference derived from an unsupported allegation. See *Polaroid Corp.* v. *Rollins Envtl. Servs. (NJ), Inc.*, 416 Mass. 684, 696 (1993).

Last, we conclude that the summary judgment materials submitted by the defendant children were insufficient to dispute Frances's deposition testimony that her interest in Delta & Delta "was given to [her]" by her father. As we previously explained, the Sullivan Bille records merely show that Frances made a capital contribution on January 2, 1973. In *Demoulas I, supra* at 547, we explained that "one who receives a gift obtains the property without consideration, and thereby has not given value and will not be a bona fide purchaser." See *Demoulas III, supra* at 582-583. The defendant children have not submitted any other evidence to dispute the fact that Frances' initial interest in Delta & Delta was a gift. Instead, they rely on semantics to argue that, "Frances' use of the word 'give' may not fairly be equated with the word 'gift.' Rather, Frances was 'given' the

opportunity to participate in Delta, and she paid to participate." The defendant children provide no record support for this argument, which belies common sense.

Because the defendant children proffered no other material evidence, apart from the Sullivan Bille documents, to support their contention that their capital contributions were made in exchange for their initial interests in Delta & Delta, they failed to satisfy their burden that they were bona fide purchasers for value. Further, they failed to establish that there was a genuine, triable issue that Frances did not obtain her interests in Delta & Delta as a gift from Telemachus. For these reasons, summary judgment in favor of the plaintiffs on this issue was proper.

B. *The Defendant Children's DSM Stock.*

We recite the relevant facts found by the judge,[13] supplemented by some previously found facts that appear in the record appendix. In early 1977, Telemachus, as coexecutor of his brother George's estate, arranged for the January 20, 1977, transfer of 920 shares of DSM stock from George's estate. Telemachus arranged for the stock transfers so that he could do whatever he wanted with the shares. He distributed varying quantities of shares to various parties, including one hundred shares to each of his four children, the defendant children, and one hundred shares to himself. Prior to the January 20, 1977, stock transfers, DSM had been owned equally by George's and Telemachus's sides of the family. At trial, the jury found that Telemachus, by transferring shares of DSM stock to, among other persons, himself and his children, defrauded Evanthea, and violated his fiduciary duty to both Evanthea and her children.

The defendant children challenge various findings and conclusions that the judge made, including her conclusion that they had notice of an adverse claim. Where a purchaser acquires property, here stock, with notice of an adverse claim, he is not a bona fide purchaser. G. L. c. 106, § 8-302. In *Demoulas III, supra* at 576, we explained that "mere notice that one is dealing with a fiduciary does not create a duty of inquiry." However, a purchaser is charged with notice of an adverse claim if he "has knowledge that . . . the transaction is for the individual benefit of the fiduciary." G. L. c. 106, § 8-304 (3). See *Demoulas III,*

---

[13]The evidence before the judge included various submissions by the parties in addition to the defendant children's testimony at the evidentiary hearing.

*supra*. An "adverse claim" is defined as "a claim that a transfer was or would be unauthorized or wrongful or that a particular adverse person is the owner of or has an interest in the security." G. L. c. 106, § 8-302 (3).

We reject the defendant children's argument that the judge erroneously substituted a constructive knowledge standard, in the place of an actual knowledge standard, when she concluded that they had notice of an adverse claim. We agree with the defendant children that the "knowledge" required in G. L. c. 106, § 8-304 (3), refers to actual knowledge. See G. L. c. 106, § 1-201 (25). See also 4 A.W. Scott & W.F. Fratcher, Trusts § 297.6 (4th ed. 1989). We view the judge's statement that the defendant children "had reason to know" that the stock transfers benefited Telemachus individually, as a preliminary observation on her part. The remainder of the judge's analysis (which the defendant children disregard) clearly expresses a finding that "the defendant children *knew* [the disputed] transaction[s] [were] for the individual benefit of Telemachus" (emphasis added). In reviewing the judge's decision in its entirety, we conclude that she applied the correct legal standard.

The defendant children testified to the following relevant facts, which the judge incorporated into her findings. Prior to the 1977 stock transfers, the defendant children were shareholders of DSM and knew that their father ran and controlled DSM. They knew that, prior to their uncle George's death, DSM had been owned equally by George's family and by Telemachus's family. The defendant children also knew that their father was an executor of George's estate, and that their stock came from George's estate. Frances, Glorianne, and Arthur T. knew as well that all of the defendant children acquired one hundred shares of DSM stock from George's estate. The defendant children stated that, had they thought of it at the time of the stock transfers, they would have known that, by acquiring the stock from the estate, ownership of DSM shifted to their family. We conclude that from these facts, particularly the latter fact, the judge permissibly inferred that the defendant children possessed knowledge that the stock transfers shifted majority ownership of DSM to Telemachus's side of the family.

We also conclude that the judge properly inferred that DSM stock in the hands of the defendant children "had the same effect as if Telemachus had transferred the stock to himself." This inference was reasonably warranted from the judge's findings of

fact concerning the extensive nature and extent of Telemachus's control over the children's investments and finances, as well as his extensive control over DSM. The inference was also buttressed by the following: the judge's previous findings that Telemachus virtually controlled the defendant children in terms of their individual finances and management of DSM; the judge's previous findings that, since 1971, Telemachus has controlled the board of directors of DSM and has essentially "run the show"; the testimony of the defendant children concerning the extensive involvement their father had in managing their investments and finances, and conversely, their limited involvement, and reliance on him, in such affairs; and the testimony of the defendant children concerning the control their father exercised over DSM in 1977.

The defendant children maintain that the judge erred in concluding that the stock transfers altered control over DSM because Telemachus, since George's death and pursuant to various voting trust agreements, controlled DSM, as all shareholders' voting powers were vested solely with him. Irrespective, however, of the lack of the change in Telemachus's control over DSM at the time of the stock transfers, the defendant children should be charged with knowing that Telemachus benefited from the stock transfers. Given all of the evidence we have previously mentioned, had the defendant children opened their eyes and looked, they would have seen that the stock transfers to them resulted in a benefit to Telemachus himself. He obtained, and secured, given his control over the defendant children's investments and finances, a majority ownership of DSM for his family to the detriment of his brother's family. This conclusion is fully consistent with the legal principle explained in *Demoulas III, supra* at 577, quoting *West's Case*, 313 Mass. 146, 151 (1943), namely that, "[i]f a person confronted with a state of facts closes his eyes in order that he may not see that which would be visible and therefore known to him if he looked, he is chargeable with 'knowledge' of what he would have seen had he looked." For these reasons, we discern no error in the judge's conclusion that the defendant children were not bona fide purchasers of their shares of DSM stock. We, therefore, need not reach the defendant children's other claims concerning their bona fide purchaser status, or, alternatively, irrespective of that status, whether they were unjustly enriched by the stock transfers.

C. *Alternative Forms of Relief.*

We reject the defendant children's contentions that the judge, instead of imposing constructive trusts on the defendant children's fifty-three shares of DSM stock, and on their initial interests in Delta & Delta, should have awarded money damages from Telemachus to the plaintiffs in an amount equal to the value of those assets. In *Demoulas III, supra* at 572, we stated, with respect to the defendant children's DSM stock: "We agree with the judge that, based on the significant wrongdoing committed by Telemachus (as found by the jury), the 400 shares of DSM stock could be made subject to a constructive trust . . . unless [the defendant children] established that they were bona fide purchasers." We also instructed: "If it is determined that the defendant children were not bona fide purchasers of the Delta & Delta interests received in 1971, then correction of the agreement to reflect the original equal ownership between the families is appropriate." *Id.* at 583. Having subsequently concluded that the defendant children were not bona fide purchasers of their DSM stock or their initial interests in Delta & Delta, the judge, consistent with our directive in *Demoulas III, supra*, properly imposed a constructive trust on the DSM shares, and properly reformed Delta & Delta. See Restatement of Restitution § 201(1) (1937) ("Where a fiduciary in violation of his duty to the beneficiary transfers property or causes property to be transferred to a third person, the third person, if he gave no value or if he had notice of the violation of duty, holds the property upon a constructive trust for the beneficiary"). See also Restatement (Second) of Trusts §§ 291-293 (1959) (beneficiary has choice of having property restored to him or obtaining its value, and has choice of recovering from either the trustee or the transferee).

### III. APPEAL OF TELEMACHUS AND DSM.

A. *Costs for Daily Trial Transcripts.*

In the judgment, the judge ordered Telemachus to pay the plaintiffs' costs because they were the prevailing parties in the stock transfer action. Telemachus challenges the taxation of costs ($74,398.22) that the plaintiffs expended for daily trial transcripts. The plaintiffs maintain that the judge permissibly exercised discretion to award them these costs. We disagree.

The judge should not have concluded that the plaintiffs' expense for daily trial transcripts were taxable costs under Mass.

R. Civ. P. 54 (d), as appearing in 382 Mass. 821 (1980). Under the common-law American rule, which is the rule in Massachusetts, litigants are required to bear their own litigation expenses unless "a statute permits awards of costs . . . or . . . a valid contract or stipulation provides for costs, or . . . rules concerning damages permit recovery of costs." *Waldman* v. *American Honda Motor Co.*, 413 Mass. 320, 322 (1992), quoting *Broadhurst* v. *Director of the Div. of Employment Sec.*, 373 Mass. 720, 721-722 (1977). Rule 54 (d), provides, in pertinent part, that, "[e]xcept when express provision therefor is made either in a statute of the Commonwealth or in these rules, costs shall be allowed as of course to the prevailing party unless the court otherwise directs . . . ." This rule is consistent with G. L. c. 261, § 1, which provides that "[i]n civil actions the prevailing party shall recover his costs, except as otherwise provided." See Reporters' Notes to Mass. R. Civ. P. 54, Mass. Ann. Laws, Rules of Civil Procedure at 359 (Lexis 1997). While both the rule and the statute "vest the court with discretion as to whether costs shall be taxed at all," *id.*, where such costs are permitted, an award of costs is allowable only when based on "specific affirmative authority." *Broadhurst* v. *Director of the Div. of Employment Sec., supra* at 722. See *Smith* v. *New England Aircraft Co.*, 270 Mass. 511, 534 (1930). In comparison to other rules and statutes, such as Mass. R. Civ. P. 54 (e), as appearing in 382 Mass. 829 (1981), which expressly grants the court discretion to tax costs associated with depositions, or G. L. c. 261, § 23, which expressly grants the court discretion to tax entry fee costs, neither Mass. R. Civ. P. 54 (d), nor G. L. c. 261, § 1, expressly authorizes the taxation of trial transcript costs. Nor does any other provision of G. L. c. 261 authorize the taxation of trial transcript expenses as costs.[14] There is nothing in the two Federal precedents cited by the plaintiffs that aids them here. We conclude that the costs sought by the plaintiffs for daily trial transcripts are not recoverable costs.

B. *Selection of Independent Search Firm.*

The judgment contains various corporate governance provi-

_____

[14]Here, we disagree with the judge's conclusion that trial transcript costs are "akin to costs for procuring evidence" under G. L. c. 261, § 11. Unlike a transcript of a potential witness's deposition testimony, which procures evidence and may itself be admitted in evidence at trial, where, for instance, the deponent becomes unavailable to testify, a trial transcript does not constitute or procure evidence. A trial transcript records evidence admitted at trial.

sions, including the following provision: "The board of directors [of DSM will] elect qualified officers from a list of candidates generated by an independent search firm of the [p]laintiffs' selection." The defendants contend, for the first time on appeal, that the judge erred in denying their motion to amend this provision, because of alleged dissension among the plaintiffs, to permit instead a majority of the shareholders of DSM to select the independent search firm. The defendants claim that evidence of dissension is significant because it creates doubt whether the corporate governance provision could be implemented if the plaintiffs are unable to act together as a controlling majority. Because the defendants failed, however, to raise this issue to the judge, we refuse to address it. See *Commonwealth* v. *Doe*, 405 Mass. 676, 681 n.4 (1989). We reject the defendants' other contentions that the judge somehow otherwise erred in denying their motion to amend the corporate governance provision.

C. *Calculation Errors in the Judgment.*

The defendants claim that the judge erred in denying their motion to correct certain calculation errors in the judgment. The plaintiffs stipulate to the corrections, and seek the inclusion of an additional correction to the judgment, to which the defendants do not object, and which the defendants sought correction of in their initial motion. The defendants' motion was timely, and enforcement of the current judgment would result in the defendants paying more to the plaintiffs than amounts actually owed. We conclude that the judge erred by failing to incorporate the requested corrections into the judgment. Because the defendants acknowledge that the plaintiffs' proposed form of judgment incorporates the corrections requested by them, and because this proposed form also includes the additional correction sought by the plaintiffs, the judge should enter this proposed judgment as a second amended judgment following rescript.[15]

IV. APPEAL OF THE PLAINTIFFS.

The plaintiffs challenge a provision of the judgment requiring

[15]This proposed judgment commences on page 2785 of the parties' record appendix. When entering this second amended judgment, the judge should, consistent with note 4 of the judgment, designate the corrections therein. In addition, the judge should delete the provision on the last page of the proposed judgment regarding a stay during appeal. Last, the judge may paginate and change the date of the second amended judgment.

them to reimburse the defendant children for tax payments that the defendant children made in connection with 1,150 shares of DSM treasury stock which was subject to a constructive trust for the plaintiffs' benefit.[16] This provision was correctly included in the judgment as it applies to the defendant children.[17]

Although the tax payment reimbursement provision in the judgment varied from the tax payment offset provision in the second amended judgment,[18] the judge's inclusion of the tax payment reimbursement provision did not exceed the scope of proceedings ordered in *Demoulas III, supra.* In *Demoulas III, supra* at 591, we remanded the case for further proceedings concerning the defendant children's bona fide purchaser status of the 400 shares of DSM stock they obtained from George's estate, and of their initial interests in Delta & Delta. We stated: "In connection with the supplemental judgment, the judge may also make any other adjustments in the relief otherwise granted in the second amended judgment to reflect other matters which in fairness ought to be addressed or modified as a result of the evidentiary hearing." *Id.* at 591-592. During the remand proceedings, the judge significantly reduced the amount of shares of DSM stock that the defendant children, who lacked the status of bona fide purchasers, were required to transfer to the George A. Demoulas Trust.[19] Instead of transferring a total of 400 shares, the defendant children were ordered to transfer a total of only fifty-three shares. This reduction of shares, in turn,

---

[16]The 1,150 shares of DSM treasury stock at issue here is distinct and separate from the 920 shares of DSM stock from George's estate that Telemachus transferred on January 20, 1977, to various parties, including the transfer of one hundred shares to each of his four children. The treasury stock constitutes stock that DSM had wrongfully redeemed from George's children, and from two DSM employees.

[17]The plaintiffs do not challenge the inclusion of this provision as applied to Telemachus.

[18]Before we ordered further proceedings in *Demoulas III, supra,* the second amended judgment provided that the defendants "are entitled to an offset against money owed as a result of this judgment to reflect taxes paid" on the treasury stock. Following the remand proceedings, the judgment provided, in pertinent part, that the defendants "are entitled to an offset against money owed as a result of this judgment, or, as the case may be, reimbursement from those plaintiffs who have received transfer of the [treasury stock] to reflect taxes paid."

[19]The amount of stock required from the defendant children was reduced because the judge previously had ordered (during the remand proceedings) Telemachus, as the wrongdoer, to transfer his remaining 347 shares of DSM stock, which completely depleted him of his DSM stock.

significantly reduced the amounts of distributions and earnings less taxes thereon (disgorgements) that the defendant children were required to transfer with their shares of stock. With only a tax payment offset provision in the judgment, when applying the disgorgements on the fifty-three shares of DSM stock against the taxes that the defendant children paid in connection with the treasury stock, the defendant children would incur a greater tax burden than the tax burden they would have incurred had they been able to apply the disgorgements on their 400 shares of DSM stock against the taxes they paid on the treasury stock. In view of this potential result, and in view of the reduction of shares required from the defendant children during remand proceedings, the judge's inclusion of the tax payment reimbursement provision in the judgment constituted a permissible modification within the scope of the remand.

We reject the plaintiffs' contentions that the defendant children are precluded from recovering money from them in excess of the amount of money damages that the defendant children owe to the plaintiffs, and from being reimbursed for any tax payments they made in connection with the treasury stock due to their failure to assert a timely counterclaim, or claim for recoupment. The plaintiffs benefited from the equitable relief awarded to them, which included the rescission of 1,150 shares of DSM treasury stock, and the restoration of those shares, together with disgorgements, to them. The plaintiffs concede that the defendant children paid more taxes in connection with the treasury stock than they would have otherwise had DSM not wrongfully redeemed that stock. Had the plaintiffs owned those shares at that time, they would have been responsible for this tax burden. It is settled that "one who seeks equity must do equity and that a court will not permit its equitable powers to be employed to accomplish an injustice." *Clark* v. *Greenhalge*, 411 Mass. 410, 417 (1991), quoting *Pitts* v. *Halifax Country Club, Inc.*, 19 Mass. App. Ct. 525, 533 (1985). We conclude that the plaintiffs, who successfully invoked the equitable powers of the court to reclaim ownership of DSM's treasury stock, cannot now avoid the tax burdens associated with that stock ownership, and that the judge did not err in including the tax payment reimbursement provision in the judgment. See *Brown* v. *Boston*, 353 Mass. 740, 744 (1968). See also Restatement of Restitution § 158 (1937) ("A person is entitled to specific restitution of property from another . . .

only on condition that he compensate the other for expenditures with reference to the subject matter which have inured to his benefit . . ."). Our conclusion obviates the need to address the plaintiffs' remaining arguments concerning this issue.

## V. CONCLUSION.

We affirm the orders denying the recusal motions in the shareholder derivative and stock transfer actions. In the stock transfer action, we affirm the grant of summary judgment to the plaintiffs concerning the defendant children's bona fide purchaser status of their initial interests in Delta & Delta, and the judgment that the defendant children were not bona fide purchasers of their DSM stock. We vacate the portion of the order allowing the plaintiffs' motion for approval of daily trial transcript costs. We affirm the judgment with the exception of certain calculation errors therein, to which the parties agree, and remand the case to the Superior Court to enter, as directed in Part III (C) of this opinion, a second amended judgment following rescript that incorporates the corrections of those errors.

*So ordered.*