Steven A. GERLAUGH, Appellant

v.

COMMONWEALTH of Kentucky,
Appellee.

No. 2002–SC–0382–MR.

Supreme Court of Kentucky.

Feb. 17, 2005.

Misty Dugger Judy, Department of Public Advocacy, Assistant Public Advocate, Frankfort, KY, Counsel for Appellant.

Gregory D. Stumbo, Attorney General, Courtney J. Hightower, Assistant Attorney General, Office of Attorney General, Criminal Appellate Division, Frankfort, KY, Counsel for Appellee.

COOPER, Justice.

Appellant, Steven A. Gerlaugh, was convicted by a Montgomery Circuit Court jury of robbery in the first degree and sentenced to twenty years in prison. He appeals to this Court as a matter of right, Ky. Const. § 110(2)(b), asserting the following claims of error, *viz:* (1) denial of a speedy trial; (2) improper eyewitness identification; (3) admission of hearsay evidence; (4) admission of a firearm that was not proven to have been connected to the crime; (5) admission of the description and a photograph of an alleged but unidentified co-perpetrator; (6) admission of evidence of Appellant's post-arrest silence; (7) insufficiency of the evidence to support a conviction. We reverse and remand for a new trial because of the improper admission of the hearsay evidence and the insufficiently identified firearm.

On Father's Day, June 17, 2001, Richard and Kristina Boone had dinner with Richard's son and daughter-in-law before returning to their residence in Jeffersonville, Montgomery County, Kentucky. On their way home, they stopped at R & D Food Mart to purchase cigarettes. While doing so, Mrs. Boone noticed another female customer in the store. The Boones arrived at their residence at about 10:00 p.m. Approximately fifteen minutes later, they heard a knock at their door. Upon opening the door, Mr. Boone was confronted by a man and a woman. The man struck Boone in the face with a pistol, knocking him across the room and rendering him partially insensible. The two intruders then ordered Mrs. Boone to remain on the sofa as they proceeded to steal wrist watches, jewelry, approximately $400.00 in cash, and all of the telephones in the residence. Before departing, they bound the hands and feet of both victims with wire tie straps. Mrs. Boone ultimately freed herself and her husband. She then proceeded to a neighbor's residence and called for emergency assistance.

On June 25, 2001, Appellant was arrested and charged with the robbery. Although neither perpetrator wore a mask, Mr. Boone could not identify Appellant as the person who entered his residence on June 17, 2001, and struck him in the face with a pistol. However, he did overhear the male robber say, "You shouldn't let other people know your business," before leaving his home. Although Boone did not know Appellant, both were acquainted with Dennis Yarber. Boone had fathered a child by Yarber's daughter, and Appellant and Yarber had been childhood friends in Ohio. According to Boone, Yarber knew that Boone kept large amounts of cash at his residence and had been inside Boone's residence "looking around" three or four days before the robbery. The police found a 9–mm pistol, which was introduced at trial, in Yarber's possession.

Mrs. Boone recognized the female perpetrator as the person she had seen inside the R & D Food Mart shortly before the robbery. The woman has never been located or charged. Although Mrs. Boone had never seen Appellant before the robbery, she subsequently identified him by photograph and in person during trial as being the male perpetrator. She had also told Detective Shane Barnes that the male perpetrator was wearing a green, long-sleeved shirt with a button-down collar, two breast pockets, and a shirttail rounded off at the bottom. After Appellant's arrest, Barnes found a shirt matching that description in Appellant's vehicle.

## I. SPEEDY TRIAL.

Appellant was arrested in Madison County on a charge of possession of a handgun/firearm by a convicted felon on June 25, 2001, and bond was set at $20,000. While in custody on that charge, he was

served with a warrant on this robbery charge. He was indicted on the robbery charge on July 13, 2001, and arraigned on July 27, 2001. Bond was set at $50,000. His trial was initially scheduled for January 15, 2002, but was continued until March 20, 2002, because of a conflict with an ongoing murder trial. That March 20th trial date was also continued because of a scheduling conflict. On March 21, 2002, Appellant filed a motion for an immediate trial or for pretrial release. In response to this motion, the trial court set a new trial date of April 3, 2002, and the case was tried on that date. The record does not reflect how long Appellant remained in custody on the Madison County charge or when or if that charge was ever resolved. Except for being in pretrial detention, Appellant identifies no prejudice caused by the fact that his trial was held in April instead of January or March. Thus, the issue becomes whether the nine-month lapse of time between indictment and trial was presumptively prejudicial.

In *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), the United States Supreme Court established a four-part test for determining whether a defendant's Sixth Amendment right to a speedy trial has been violated. However, that inquiry is triggered only if the length of delay is presumptively prejudicial. *Id.* at 530, 92 S.Ct. at 2192. In *Doggett v. United States*, 505 U.S. 647, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992), the Court held that the delay becomes presumptively prejudicial "as it approaches one year." *Id.* at 652 n. 1, 112 S.Ct. at 2691 n. 1. *See Cowart v. Hargett*, 16 F.3d 642, 646 (5th Cir.1994) ("delay of less than one year will rarely qualify as presumptively prejudicial"). In *Barker*, the Court held that ten months of pretrial incarceration was only minimally prejudicial. *Id.* at 534, 92 S.Ct. at 2194. And in *United States v. Cope*, 312

F.3d 757 (6th Cir.2002), a delay of eight months and three weeks was held not presumptively prejudicial. *Id.* at 778. *See also United States v. Titlbach*, 339 F.3d 692, 699 (8th Cir.2003) (thirteen-month delay presumptively prejudicial, but eight-month delay not presumptively prejudicial); *United States v. Kalady*, 941 F.2d 1090, 1095–96 (10th Cir.1991) (eight-month delay not presumptively prejudicial); *Arnold v. McCarthy*, 566 F.2d 1377, 1382–83 (9th Cir.1978) (nine-month delay not presumptively prejudicial).

Similarly, we held in *Dunaway v. Commonwealth*, 60 S.W.3d 563, 569 (Ky.2001), that a thirteen and one-half month delay was presumptively prejudicial, but in *Brown v. Commonwealth*, 934 S.W.2d 242, 248–49 (Ky.1996), that a ten-month delay was not presumptively prejudicial. The nine-month delay in this case was not presumptively prejudicial; thus, absent some other claim of prejudice, we need not address the remainder of the *Barker* analysis. Appellant was not denied his constitutional right to a speedy trial.

## II. EYEWITNESS IDENTIFICATION.

Appellant did not preserve this issue for appellate review but seeks review for palpable error, *i.e.*, "manifest injustice." KRE 103(e); RCr 10.26. Kristina Boone observed the male perpetrator for approximately fifteen minutes as he and his female companion ransacked her residence. Shortly after the police arrived, Mrs. Boone described the man as a white male, thirty to thirty-five years old, with brown, medium-length hair, of average build, and approximately 5' 6" tall. She also described the green shirt mentioned *supra*. On the morning of June 20, 2001, Mrs. Boone spent several hours with a forensic sketch artist, at which time she described the male perpetrator as a white male in his late thirties to early forties, with blondish-

brown, slightly wavy shoulder-length hair, bluish-green eyes, tan skin, weighing approximately 150–160 pounds, and approximately 5′ 4″ tall. Even Appellant admitted at trial that the sketch that the artist rendered is a remarkable resemblance of him. Nevertheless, he claims on appeal that Mrs. Boone's description was flawed because he was fifty-two years old, fair-haired, blue-eyed, and 5′ 8″ tall.

 Meanwhile, Detective Barnes was able to obtain a driver's license photograph from the county of Appellant's residence in Ohio. Though the photograph was not obtained until after completion of the artist's sketch, it is almost an exact replica of the sketch. Barnes assembled a "photo-pack" that included photographs of Appellant and five other individuals, none of whom had blonde hair or light-colored eyes. However, the other individuals did have brown hair that matched Mrs. Boone's original description of the male perpetrator. She easily selected Appellant as the person who had entered her residence on the night of June 17, 2001. At trial, she again identified Appellant as the male perpetrator. On appeal, Appellant claims Mrs. Boone's in-trial identification was tainted by the improper photo-pack line-up in which Appellant was the only fair-haired, light-eyed person depicted.

A conviction based on identification testimony following pretrial identification violates the defendant's constitutional right to due process whenever the pretrial identification procedure is so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. The determination of whether the in-trial use of identification testimony violates due process involves a two-step process. First, the court examines the pre-identification encounters to determine whether they were unduly suggestive. If so, the identification may

still be admissible if under the totality of the circumstances the identification was reliable even though the [identification] procedure was suggestive.

*Dillingham v. Commonwealth*, 995 S.W.2d 377, 383 (Ky.1999) (internal citations and quotations omitted). Assuming the photo-pack was suggestive, we have adopted the test employed in *Neil v. Biggers*, 409 U.S. 188, 199–200, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972), to determine whether, under the totality of the circumstances, the identification was reliable. *See Riley v. Commonwealth*, 620 S.W.2d 316, 318 (Ky.1981). That test requires examination of five factors: 1) the opportunity of the witness to view the criminal at the time of the crime; 2) the witness' degree of attention; 3) the accuracy of his or her prior description of the criminal; 4) the level of certainty demonstrated by the witness at the confrontation; and 5) the time between the crime and the confrontation. *Neil*, 409 U.S. at 199–200, 93 S.Ct. at 382. All of these factors weigh in favor of the admission of Mrs. Boone's eyewitness testimony. We do not regard the minor discrepancies between her first and second descriptions to require suppression. Remember, she had already positively identified Appellant to the sketch artist before seeing the photograph. Obviously, no manifest injustice occurred here.

### III. HEARSAY.

At the time of the robbery, Appellant was a resident of Kettering, Ohio, located approximately 180 miles and a three-hour drive from Jeffersonville, Kentucky. At trial, he produced four alibi witnesses, all of whom testified that on June 17, 2001, Appellant was with them in Kettering at a Father's Day cookout until approximately 9:15 p.m. In rebuttal, the Commonwealth offered the testimony of Sergeant Corky Abney of the Montgomery County Regional Jail. Abney had searched Appellant's

belongings at the jail on the morning of trial and discovered a letter purportedly written to Appellant by Brian DeWitt, who shared an apartment with Appellant in Ohio. DeWitt was not one of Appellant's alibi witnesses and did not appear at trial. Appellant objected to the admission of the letter on the basis of hearsay and inability to cross-examine DeWitt. The Commonwealth asserted no basis whatsoever for the admission of the letter into evidence. Apparently misinterpreting Appellant's objection as a motion for a continuance to obtain DeWitt's presence for the purpose of cross-examination, the trial court admitted the evidence: "I am denying the motion for a continuance. I said we were going to finish this trial today. I have got hearings scheduled for tomorrow." Abney then read to the jury the following excerpt from the letter:

As for the 17th, you need to find out by a discovery packet, to see what evidence they have, before anyone puts their neck out there. Remember, you are in Kentucky. They don't play, especially with out-of-staters.

On appeal, the Commonwealth asserts that the excerpt was admissible as "a statement by a coconspirator made during the course and in furtherance of the conspiracy," KRE 801A(b)(5), theorizing that the letter proved that Appellant, DeWitt, and the four alibi witnesses conspired to produce perjured testimony at Appellant's trial. The letter, itself, however, was the only evidence offered to prove the existence of the alleged conspiracy or Appellant's and DeWitt's participation in it.

■ The hearsay exception for out-of-court statements by a coconspirator applies only upon proof that (1) a conspiracy existed, (2) both the defendant and the declarant were participants in the conspiracy, and (3) the statement was made during and in furtherance of the conspiracy.

*Marshall v. Commonwealth*, 60 S.W.3d 513, 520 (Ky.2001); Robert G. Lawson, *The Kentucky Evidence Law Handbook* § 8.30[4], at 611 (4th ed. LexisNexis 2003). Before the adoption of the Kentucky Rules of Evidence in 1992, it had long been the common law rule that the Commonwealth could not prove the existence of a conspiracy or the participation in it by the defendant and an alleged coconspirator by the hearsay statement of a coconspirator.

[T]he evidence to establish the conspiracy must be found either in things said, done, or written by the one on trial or in parts of the evidence other than that coming directly or indirectly from the alleged co-conspirators of the party on trial.

*Canada v. Commonwealth*, 262 Ky. 177, 89 S.W.2d 880, 881 (1936).

The commonwealth sought to show by several witnesses that other members of the night riders told them that the defendant Jake Ellis was a night rider. All of these declarations were merely hearsay, and were not admissible to show that the defendant belonged to the band of conspirators mentioned. The rule is elementary that, where a defendant is charged with being a conspirator, evidence must be first shown which, in the absence of contradictory evidence, would establish that he was a member of the band.... Here it was sought to be shown that the defendant belonged to the band of conspirators, by hearsay declarations of the conspirators themselves. This evidence, as said before, is clearly incompetent, and the trial judge correctly excluded it.

*Commonwealth v. Ellis*, 133 Ky. 625, 118 S.W. 973, 976 (1909). This same common law rule, referred to as "bootstrapping," was also applied in the federal courts. *Glasser v. United States*, 315 U.S. 60, 75, 62 S.Ct. 457, 467, 86 L.Ed. 680 (1942)

("Otherwise hearsay would lift itself by its own bootstraps to the level of competent evidence.").

Now, preliminary rulings on admissibility are made under KRE 104(a):

Preliminary questions concerning ... the admissibility of evidence shall be determined by the court, subject to the provisions of subdivision (b) of this rule [relevancy conditioned on fact]. *In making its determination it is not bound by the rules of evidence except those with respect to privileges.*

(Emphasis added.) The rule permits the trial court to consider hearsay evidence in making a preliminary finding of fact necessary to the admissibility of evidence. *Kotila v. Commonwealth,* 114 S.W.3d 226, 235 (Ky.2003); KRE 104(a) Drafters' Commentary (1989). The issue then becomes what effect the adoption of KRE 104(a) had on the common law rule against "bootstrapping," *i.e.,* using the out-of-court statement, itself, to prove the foundation requirements necessary for its admission into evidence? That was the issue we did not reach in *Commonwealth v. King,* 950 S.W.2d 807, 808 (Ky.1997), because the offense in *King* occurred prior to the adoption of the Kentucky Rules of Evidence. *See* KRE 107(b).

One of the objectives of the drafters of the Kentucky Rules of Evidence was to achieve uniformity with the Federal Rules of Evidence (FRE) to the extent possible and to depart from the Federal Rules only for good reason. KRE Study Committee, Prefatory Note (1989). KRE 104(a) is identical to FRE 104(a); and in *Bourjaily v. United States,* 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987), the United States Supreme Court specifically addressed the effect of FRE 104(a) on the foundation requirements for admission of out-of-court statements by coconspirators. *Bourjaily* held that FRE 104(a) authorizes a trial court, when making the preliminary factual determinations that a conspiracy existed and that the defendant and the declarant were participants in it, to consider hearsay evidence, including the out-of-court statement whose admissibility is at issue. *Id.* at 181, 107 S.Ct. at 2781 ("To the extent that *Glasser* meant that courts could not look to the hearsay statements themselves for any purpose, it has clearly been superseded by Rule 104(a)."). However, the Court expressly left undecided the question of whether the existence of a conspiracy and the defendant's participation in it could be proven solely by such statements. *Id.* ("We need not decide in this case whether the courts below could have relied solely upon Lonardo's hearsay statements to determine that a conspiracy had been established by a preponderance of the evidence.").

The federal rule regarding out-of-court statements by coconspirators, FRE 801(d)(2)(E), was amended in 1997 to add the following:

The contents of the statement shall be considered but are not alone sufficient to establish ... the existence of the conspiracy and the participation therein of the declarant and the party against whom the statement is offered under subdivision (E).

The Advisory Committee's Note to the 1997 amendment states that the amendment is in accordance with the existing practice of every court of appeals that has resolved the issue. Fed.R.Evid. 801 advisory committee's note. Indeed, in the ten years between *Bourjaily* and the 1997 amendment, every federal court of appeals that considered the issue held that the existence of a conspiracy and the participation in it by the defendant and the declarant could not be proven solely by the out-of-court statement of an alleged coconspirator. There must be some indepen-

dent corroborating evidence to support the trial court's finding of fact under KRE 104(a). *E.g., United States v. Clark*, 18 F.3d 1337, 1341–42 (6th Cir.1994); *United States v. Sepulveda*, 15 F.3d 1161, 1181–82 (1st Cir.1993); *United States v. Beckham*, 968 F.2d 47, 51 (D.C.Cir.1992); *United States v. Gambino*, 926 F.2d 1355, 1361 n. 5 (3d Cir.1991); *United States v. Byrom*, 910 F.2d 725, 736 (11th Cir.1990); *United States v. Garbett*, 867 F.2d 1132, 1134 (8th Cir.1989); *United States v. Silverman*, 861 F.2d 571, 577–78 (9th Cir.1988); *United States v. Daly*, 842 F.2d 1380, 1386 (2nd Cir.1988); *United States v. Zambrana*, 841 F.2d 1320, 1344–45 (7th Cir.1988); *United States v. Hernandez*, 829 F.2d 988, 993 (10th Cir.1987).

■■ KRE 801A(b)(5) is silent on this issue, as was FRE 801(d)(2)(E) prior to the 1997 amendment. However, the drafters of the Kentucky Rules of Evidence noted that the rule was identical to pre-existing Kentucky law, KRE 801A Drafter's Commentary (1989), while also noting that KRE 104(a) permits trial courts to "consider hearsay evidence in resolving such questions ... even weigh the very evidence whose admissibility is dependent upon determination of the preliminary question," citing *Bourjaily*. KRE 104 Drafter's Commentary (1989). As pointed out *supra*, pre-existing Kentucky law required preliminary proof of the existence of a conspiracy and participation in it by both the defendant and the declarant, but did not permit any "bootstrapping," *i.e.*, the alleged coconspirator's out-of-court statement could not be used to prove those facts. We conclude, as did the U.S. Supreme Court in *Bourjaily* and the drafters of our rules, that KRE 104(a) now permits partial "bootstrapping" to the extent that the trial court may consider the challenged out-of-court statement in making the required preliminary findings.

However, we also conclude, as did every federal court of appeals that considered the issue before the 1997 amendment of FRE 801(d)(2)(E), that the foundational requirements cannot be proven *solely* by the out-of-court statement of an alleged coconspirator but must be supported by some independent corroborative evidence of those facts. Since there was no independent corroborative evidence of a "perjury conspiracy" in this case outside the inference the Commonwealth draws from the statement in DeWitt's letter, the trial court erred in admitting the excerpt from the letter into evidence. *Meredith v. Commonwealth*, 959 S.W.2d 87, 91 (Ky. 1997).

■ We reject the Commonwealth's argument that Appellant somehow waived or cured the error by subsequently attempting on surrebuttal to attribute a non-conspiratorial meaning to the excerpt from DeWitt's letter, *i.e.*, that DeWitt had previously been incarcerated in Kentucky, was fearful of Kentucky authorities, and feared that the alibi witnesses would be charged with perjury if they were mistaken in their testimony. In *Salinas v. Commonwealth*, 84 S.W.3d 913 (Ky.2002), we held that defense counsel did not waive such error by cross-examining a witness who had been allowed to testify to inadmissible hearsay evidence:

> If that were true, any party against whom evidence was improperly admitted would be required to forego cross-examination and enhance the risk of losing at trial, or attempt to cross-examine in an effort to mitigate the prejudicial effect of the evidence and thereby be deemed to have acquiesced in the error.

*Id.* at 919. Appellant's attempted explanation on surrebuttal falls into the same category and thus does not constitute a waiver of the trial court's error.

## IV. IDENTIFICATION OF REAL EVIDENCE.

Thomas Hinkle, Appellant's ex-stepson, testified that Appellant was like a father to him. On June 25, 2001, the two met at a gas station owned by Hinkle's mother (Appellant's ex-wife) in Berea, Madison County, Kentucky. After they conversed for approximately fifteen minutes, officers of the Berea Police Department arrived and arrested Appellant on a charge of being a convicted felon in possession of a firearm. The officers arranged for Powell's Towing Service to tow Appellant's vehicle to Powell's property for storage. Hinkle knew that Appellant kept a pistol hidden in the engine compartment of the vehicle. That night, he entered Powell's property, broke open the hood of the vehicle, and retrieved the pistol, "because I was thinking I was taking years off his life, and don't want to see my father go to the penitentiary for the rest of his life." Hinkle testified that he gave the pistol to Appellant's friend, Dennis Yarber. When the prosecutor displayed a gun and holster to Hinkle, the following colloquy ensued:

Q. Do you recognize this gun and holster?

A. Yes, I do.

Q. To the best of your knowledge, is this the gun that you got from....

A. I have no idea of whether it is or not.

Q. But to the best of your knowledge, is it?

. . .

A. Like I told you, I guess it is. I have no idea whether it is or....

Q. It looks like it?

A. Well, that's been months ago. Like I told you, I have been in a mental institution, and I am incompetent and I couldn't even tell you. Do you know what I mean? You all got me a nervous wreck. I know that's the reason I am here, but I don't know—I can't—that's all I can say.

Dennis Yarber testified that on June 26, 2001, Hinkle brought him a gun wrapped in terry cloth that Yarber thought was going to be a snub-nosed .38 caliber revolver. Hinkle told Yarber that "he bought it off some kid for pot" and offered to sell it to Yarber. When Yarber removed the terry cloth, he discovered that the gun was not a .38 caliber revolver but a 9–mm pistol. Yarber declined to purchase the gun but told Hinkle he would keep it for him. Six hours later, police officers arrived at Yarber's residence and confiscated the gun. The prosecutor then showed Yarber the same 9–mm pistol he had previously displayed to Hinkle, and Yarber identified the gun as being the one that Hinkle had left with him.

Detective Barnes testified that he sent the gun to a laboratory for testing but that it was found to contain no fingerprints, blood stains, or traces of skin. Appellant testified that he owned a snub-nosed .38 revolver and a sawed-off shotgun, but not a 9–mm pistol. Detective Barnes searched Appellant's vehicle and found some .38 caliber ammunition but did not find any 9–mm ammunition. (He also did not find any property stolen from the Boones, though he did find the green shirt that Mrs. Boone identified as being similar to the one worn by the male perpetrator on the night of the robbery.)

The Commonwealth did not display the 9–mm pistol to either of the victims during trial or ask either of them to describe the pistol brandished by the male perpetrator during the robbery. Detective Barnes testified twice during the Commonwealth's case-in-chief. During his first testimony, he described his investigation of the crime scene and his search of Appellant's vehicle. During his second testimony, he identified

the 9–mm pistol as being the pistol obtained from Yarber. The only evidence purporting to identify the pistol used in this robbery was the following colloquy between Barnes and the prosecutor at the conclusion of Barnes's testimony about his search of the vehicle:

> Q. Detective Barnes, what was the description of the gun that the perpetrator had?
>
> A. A blue steel automatic.
>
> Q. You did not find that in the vehicle?
>
> A. No.

■ Barnes did not state from whom he obtained the description or that the 9–mm pistol obtained from Yarber fit that description. Neither the pistol nor a photograph of it is in this record, thus we have no way of knowing whether the 9–mm pistol was a "blue steel automatic." But even if it were, Barnes's testimony, standing alone, was insufficient to identify that 9–mm pistol as the pistol used in the robbery.

> The requirement of . . . identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.

KRE 901(a). That is but another way of saying that:

> The identification requirement for tangible evidence . . . is grounded in a logical demand that, when offering a tangible object into evidence, a party should show, as a preliminary matter, its connection to the incident involved in the litigation.

Lawson, *supra*, § 11.00[2][a], at 840. We have upheld the admission of weapons into evidence based on eyewitness testimony that the weapon was the one used in the commission of the offense, *Beason v. Commonwealth*, 548 S.W.2d 835, 836–37 (Ky. 1977); that it was of the same size and shape as the weapon used in the commission of the offense, *Sweatt v. Commonwealth*, 550 S.W.2d 520, 523 (Ky.1977); or that it was found at the scene of the offense and was capable of inflicting the type of injury sustained by the victim, *Barth v. Commonwealth*, 80 S.W.3d 390, 402 (Ky.2001); *Grundy v. Commonwealth*, 25 S.W.3d 76, 79–80 (Ky.2000). However, in *Reed v. Commonwealth*, 579 S.W.2d 109 (Ky.1979), we held that testimony that it "looks like my gun but I couldn't swear to it," was insufficient identification to justify its admission into evidence:

> It is apparent from the evidence that appellant's statement that the gun looked like his falls far short of the standards of admissibility which would tend to prove that the gun was the one actually used by appellant in the robbery and subsequent shooting.

*Id.* at 111. In retrospect, *Reed* probably pushed the identification requirement too far. *See United States v. Johnson*, 637 F.2d 1224, 1247–48 (9th Cir.1980) (absolute certainty of identification not required; uncertainty affects weight, not admissibility), *abrogated on other grounds by Schmuck v. United States*, 489 U.S. 705, 715, 109 S.Ct. 1443, 1450, 103 L.Ed.2d 734 (1989). Under *Reed*, Hinkle's uncertain identification of the 9–mm pistol ("I guess it is.") would have been insufficient to prove that it was even the pistol that he retrieved from the engine compartment of Appellant's vehicle. While we are unwilling to go that far, no evidence, direct or circumstantial, competent or incompetent, identified the 9–mm pistol allegedly found in Appellant's vehicle nine days after the robbery as the pistol used in the robbery. Unless additional identification evidence is produced upon retrial, the evidence concerning the pistol shall not be admitted.

## V. DESCRIPTION AND PHOTOGRAPH OF CO–PERPETRATOR.

 Mrs. Boone testified that the female perpetrator was the same woman she had seen in the R & D Food Mart shortly before the robbery. The store had a surveillance camera, and Mrs. Boone was able to identify the woman from the surveillance photographs. She also assisted the sketch artist in preparing a depiction of the woman. The female perpetrator was never identified or charged and, obviously, this was not a joint trial. Nevertheless, the Commonwealth was allowed to introduce into evidence the surveillance camera photographs and the sketch artist's depiction of the woman. Appellant claims the photographs and depiction should have been excluded as irrelevant. We disagree.

> Implicit in [the concept of relevancy] are two distinct requirements:
>
> (1) the evidence must tend to prove the matter sought to be proved; and
>
> (2) the matter sought to be proved must be one that is of consequence to the determination of the action.

*United States v. Waldrip*, 981 F.2d 799, 806 (5th Cir.1993).

> An item of evidence, being but a single link in the chain of proof, need not prove conclusively the proposition for which it is offered. It need not even make that proposition appear more probable than not.... It is enough if the item could reasonably show that a fact is slightly more probable than it would appear without that evidence. Even after the probative force of the evidence is spent, the proposition for which it is offered still can seem quite improbable.

Lawson, *supra*, § 2.05[3], at 80 (quoting Edward W. Cleary, *McCormick on Evidence* 542–43 (3d ed.1984)).

 Appellant's defense was an alibi. The Commonwealth's best evidence was Mrs. Boone's eyewitness identification of Appellant as the male perpetrator. Thus, her credibility, particularly her powers of observation and recall, were at issue. Her ability to identify the female perpetrator as the person she had observed only briefly in the food mart heightened the credibility of her identification of Appellant, a person whom she was able to observe continuously for a period of fifteen to twenty minutes.

## VI. ALLEGED COMMENT ON SILENCE.

Appellant asserts that Detective Barnes was improperly permitted to comment on his post-arrest silence. Not only is this issue unpreserved, it is completely meritless.

 Kentucky does not have a notice-of-alibi rule, *see generally, Wardius v. Oregon*, 412 U.S. 470, 93 S.Ct. 2208, 37 L.Ed.2d 82 (1973), and the prosecutor claimed to be surprised by the testimony of the four alibi witnesses. To impeach their credibility, he inquired of each why, if the witness knew Appellant was in Ohio at the time of the robbery, he or she had not come forward sooner to clear Appellant's name. Appellant then took the stand in his own defense. When asked on cross-examination why he had not told his alibi witnesses to tell their story to the police so that he could get out of jail, Appellant responded that "I knew it was better to just keep your mouth shut," and "my lawyer told me not to say nothing to nobody." Detective Barnes then testified in rebuttal that if any of the alibi witnesses had come forward sooner, he would have investigated whether Appellant was in Ohio at the time of the robbery and, if satisfied that the alibi was true, dropped the charges.

Detective Barnes only commented on the silence of the alibi witnesses. The only

person who commented on Appellant's post-arrest silence was Appellant, himself.

## VII. SUFFICIENCY OF THE EVIDENCE.

Appellant's argument that the Commonwealth's evidence was insufficient to sustain a conviction is premised primarily upon his claim that Mrs. Boone's in-court identification should have been suppressed. Even if that were so, he would only be entitled to a new trial, not a dismissal of the charges. *Lockhart v. Nelson,* 488 U.S. 33, 40, 109 S.Ct. 285, 290, 102 L.Ed.2d 265 (1988); *Osborne v. Commonwealth,* 43 S.W.3d 234, 245 (Ky.2001). Nevertheless, we have held that Mrs. Boone's eyewitness identification of Appellant as the perpetrator was admissible. Her testimony alone was sufficient to support Appellant's conviction. *LaVigne v. Commonwealth,* 353 S.W.2d 376, 378–79 (Ky.1962) (robbery conviction supported by uncorroborated testimony of single witness); *Adams v. Commonwealth,* 560 S.W.2d 825, 826–27 (Ky.App.1977) (same, even though there were seven alibi witnesses for the defense).

Accordingly, the judgment of conviction and the sentence imposed therefor are reversed and this case is remanded to the Montgomery Circuit Court for a new trial in accordance with the content of this opinion.

LAMBERT, C.J.; GRAVES, JOHNSTONE, and KELLER, JJ., concur.

WINTERSHEIMER, J., dissents by separate opinion, with SCOTT, J., joining that dissenting opinion.

WINTERSHEIMER, Justice, dissenting.

I must respectfully dissent from the majority opinion because the trial judge did not commit error in admitting the excerpt from the letter written to Gerlaugh that was intercepted by jail authorities. The contention that the letter was prejudicial hearsay is unconvincing. KRE 801A(b)(5) states as follows:

> A statement is not excluded by the hearsay rule, even though the declarant is available as a witness, if the statement is offered against a party and is: A statement by a coconspirator of a party during the course and in furtherance of the conspiracy.

Here, the letter was evidence of a conspiracy to perjure testimony at trial. This evidence, albeit circumstantial, showed a conspiracy between Gerlaugh and others to perjure testimony. Gerlaugh stated he could not remember whether he got a letter, however, he then proceeded to explain the meaning of the letter. Based on this testimony, the trial judge did not abuse his discretion and was entirely correct in making a reasonable inference that the letter belonged to the defendant. The statement in question was made in furtherance of a conspiracy to commit perjury because the author directed Gerlaugh to discover the evidence of the prosecution before anyone perjured their testimony.

Moreover, any possible error in admitting the letter into evidence was waived when Gerlaugh testified at trial in an effort to explain the meaning of the letter. He clearly compromised his contention that he was deprived of his right of confrontation and due process. The statements of coconspirators, when made in the course of any furtherance of the conspiracy, are beyond the purview of the hearsay exclusion. *Cf. Bourjaily v. United States,* 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987).

I would affirm the conviction in all respects.

SCOTT, J., joins this dissenting opinion.