# IMPORTANT NOTICE
## <u>NOT TO BE PUBLISHED OPINION</u>

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED."
PURSUANT TO THE RULES OF CIVIL PROCEDURE
PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C),
THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE
CITED OR USED AS BINDING PRECEDENT IN ANY OTHER
CASE IN ANY COURT OF THIS STATE; HOWEVER,
UNPUBLISHED KENTUCKY APPELLATE DECISIONS,
RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR
CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED
OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE
BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION
BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED
DECISION IN THE FILED DOCUMENT AND A COPY OF THE
ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE
DOCUMENT TO THE COURT AND ALL PARTIES TO THE
ACTION.

RENDERED: MAY 22, 2008
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

## 2007-SC-000290-MR

DATE 6-12-08 E. J. A. Groutt P. C.

GARY GOODMAN                                                          APPELLANT

|       | ON APPEAL FROM JEFFERSON CIRCUIT COURT |
| :---- | :------------------------------------- |
| V.    | HONORABLE GEOFFREY P. MORRIS, JUDGE     |
|       | NO. 05-CR-002617                        |

COMMONWEALTH OF KENTUCKY                                              APPELLEE

### MEMORANDUM OPINION OF THE COURT

### AFFIRMING

This case is on appeal as a matter of right from the Jefferson Circuit Court where Appellant, Gary Goodman, was convicted of murder, four counts of criminal attempt to commit murder, tampering with physical evidence and resisting arrest. Appellant was sentenced to life on murder, twenty years each on the criminal attempt charges, five years for resisting arrest and a concurrent twelve months for resisting arrest with a sentence of life being imposed pursuant to KRS 532.110(1)(c).

Appellant raises four claims of error: (1) that he was entitled to an instruction of first-degree criminal attempt to commit manslaughter as a lesser-included offense to the four counts of criminal attempt murder; (2) that he was entitled to an instruction of first-degree wanton endangerment as a lesser-

included offense to the four counts of criminal attempt murder; (3) that he was denied due process when the Commonwealth failed to disclose, prior to trial, an incriminating statement allegedly made by Appellant; and (4) that the trial court improperly admitted weapons and ammunition unrelated to the offenses. Because none of these constitute reversible error, Appellant's conviction and sentence are affirmed.

## I. Background

In 1986, Appellant and the victim, Paula Goodman, were married. In May 2005, Paula Goodman moved out of the family home. Testimony revealed that Appellant was sad, depressed and confused about his wife's departure.

Appellant testified that, in July 2005, he learned Paula Goodman was having an affair with Blaine Morgan. Appellant's son testified that he thought Appellant seemed normal after hearing of the affair, but that he grew concerned when Appellant started having "episodes" or "acting nuts." After one of these episodes, Appellant got into an argument with his son, Kris Goodman, who testified that Appellant stuck a pistol in his face.

Morgan and Paula Goodman began living together. The morning of August 18, 2005, Morgan drove Paula Goodman from their apartment to her mother's house on Venango Street. He stopped his truck in the road next to her car, and she got out. Appellant was on his way home from work when he saw Paula Goodman outside Morgan's truck. He had never seen them together before. Appellant reacted and made a sharp turn, nearly hitting Morgan's truck in the process. Appellant indicated that Paula Goodman approached the truck to tell him she had some papers he wanted. As she was approaching, Appellant

2

had forgotten to let the truck out of gear, and the clutch "popped" causing the truck to hit Morgan's truck.

After the impact, Appellant claimed that he saw Morgan's arm move to the right like he was reaching for something, and then Morgan came up with a revolver and pointed it at him. Appellant grabbed his .357 Magnum revolver, pointed it at Morgan and pulled the trigger several times, but it would not fire. He finally noticed that it was still in its holster with the hammer strap snapped, and while he did not remember unholstering the gun, he did admit seeing his hand come up and fire the gun. Morgan stated in rebuttal that he had not owned a handgun in twenty-five years and did not have one that morning.

Appellant claims that at this point he started blacking out and did not know if Morgan fired at him. He saw Morgan back up and drive away. He claims he did not recall seeing Paula Goodman running or screaming "no," only that he saw his hand come up and saw the gun fire in her direction. Witnesses testified that Appellant walked to the back of the house and they heard two to five shots thereafter. They also testified that they saw Appellant come from the backyard moving slowly, and then get into his truck and drive away from the scene of the shooting slowly in the direction Morgan had gone.

Paula Goodman sustained one lethal wound to the side of her head and three other wounds to her legs and arm. According to the testimony of his children, Appellant came through the back door of his house, stating that he had just killed Paula Goodman and for everyone to get out of the house because the cops were on the way. Appellant's daughter told police later that morning that Appellant said, "I killed that bitch and she begged and I thought about not killing

3

her but she was lying to me and I was trying to get that motherfucker but he ran like a pussy." She later claimed she did not remember making this statement and Appellant denied saying it.

Officers Kelly Lee and Dennis Beatty arrived on the scene, meeting in the street in front of the house. They saw Appellant's son Steven come out of the house advising that his dad had killed his mom and was going to kill him too. Steven then moved behind a police car for cover. Officer Lee testified that once Steven was safely behind the car, rounds were fired from the front of the house and she took cover behind a tree. Officer Beatty had just gotten behind the truck in the driveway when rounds started coming in his direction, with several rounds hitting the truck.

Officer Lee testified that Appellant saw her and stated, "Come out from behind that tree, I've got something for you." Appellant began firing toward the tree. When Officer Lee tried to engage Appellant in conversation, he replied, "Fuck that whore, she's dead," and, "She is dead; I shot her in the fucking head and I'm going to shoot you in the fucking head too." Other officers reported that Appellant also said to Lee, "Fuck you, earn your paycheck."

Officer Lee testified that Appellant shot at her two dozen times while she was behind the tree using a shoulder-mounted long gun. Detective Smithers was moving up the driveway when he heard rounds coming through the leaves by his head and hitting the gravel near his feet.

The next morning, between 3:00 and 4:00, SWAT Officer Culver saw Appellant running toward him from the house. Culver testified that Appellant

4

pointed his fingers at him in gun-like fashion and said, "boom boom boom." A standoff with the SWAT team ensued and Appellant was apprehended.

Thereafter, Appellant's residence and vehicle were searched. Recovered items included approximately fifty firearms, rounds of ammunition, holsters, spent shell casings, a magazine and a pocket knife. After he was arrested, Appellant was hospitalized and made several incriminating statements to police and hospital staff. He did not deny murdering Paula Goodman nor did he deny firing at the officers at his home. His defense at trial consisted of a combination of seeing his wife with Morgan for the first time and claiming that he had no memory of the pertinent details surrounding the events that followed.

## II. Analysis

### A. Requested Manslaughter Instruction

At the close of evidence, the trial court held that there was enough evidence to create a jury question as to the occurrence of extreme emotional disturbance through a "triggering event" when Appellant saw his wife and Morgan together for the first time and therefore included an instruction on the lesser included offense of first-degree manslaughter. The court declined, however, to extend this ruling to the four attempted murder charges involving the police officers. The court stated that the EED triggering event served only as a defense to the actual murder and that, furthermore, no EED language was required due to the lapse of ten to fifteen minutes between the shooting of Paula and the shootout with police.

Extreme emotional disturbance is "a temporary state of mind so enraged, inflamed, or disturbed as to overcome one's judgment, and to cause one to act

5

uncontrollably from the impelling force of the extreme emotional disturbance rather than from evil or malicious purposes." McClellan v. Commonwealth, 715 S.W.2d 464, 468-69 (Ky. 1986). This requires a "triggering event" that leads to the extreme emotional disturbance. Whitaker v. Commonwealth, 895 S.W.2d 953, 954 (Ky. 1995). However, the trigger is not limited to sudden or intense events, such as were sufficient to produce the common law "sudden heat of passion": "it is possible for any event, or even words, to arouse extreme mental or emotional disturbance." Spears v. Commonwealth, 30 S.W.3d 152, 155 (Ky. 2000) (quoting Gall v. Commonwealth, 607 S.W.2d. 97, 109 (Ky. 1980)).

Additionally, the EED trigger may be a gradual series of events, rather than a single intense one, and does not have to be contemporaneous with the resulting EED. The notion of a "triggering event" may be somewhat misleading, because the concept of adequate provocation is broad enough to include the cumulative impact of a series of related events. Further, a jury may find adequate provocation even if the triggering event did not immediately precede the defendant's criminal act. Holland v. Commonwealth, 114 S.W.3d 792, 806 (Ky. 2003). Ultimately, "[i]t is for a jury to decide whether a triggering event has occurred and whether a defendant acted under the influence of EED." Springer v. Commonwealth, 998 S.W.2d. 439, 452 (Ky. 1999).

Here, the trial court did have a rationale for refusing to instruct on extreme emotional disturbance in the attempted murder counts. Despite a lapse of only fifteen minutes between shooting his wife and shooting at the officers, the court reasoned that the disturbed state of mind that could have existed when Appellant saw his wife and her lover together did not extend to his fleeing to another

6

location or the deliberate actions he took towards the stand-off with the officers. While reasonable minds could differ on this application, it is not necessary for this Court to examine this ruling for error, because the jury expressly rejected Appellant's claim of extreme emotional disturbance in killing his wife. If there is no application of EED to her killing, then there can be none in the later attempted murder charges. If there were any error in the attempted murder charges, then it was harmless. Thacker v. Commonwealth, 194 S.W.3d 287 (Ky. 2006).

## B. Alleged Statement by Appellant

LMPD Officer Galvan testified at trial that while in the doorway of Goodman's hospital room, he heard someone ask Goodman how he felt that day and heard Goodman respond, "she deserved what she got" and "I killed the fucking bitch." The latter statement had been turned over in discovery, but the former had not. Appellant asked for a mistrial, which was denied.

RCr 7.24(1) provides that "[u]pon written request by the defense, the attorney for the Commonwealth shall disclose the substance, including time, date, and place, of any oral incriminating statement known by the attorney for the Commonwealth to have been made by a defendant to any witness."

Appellant was able to establish on cross-examination that the statements were not written down by Officer Galvan and that Galvan's statement to Detective Finch on that day was inconsistent with his testimony at trial.

However, the statement was similar to other statements that were admitted. Appellant claims that allowing the statement "she deserved what she got" permitted the Commonwealth to introduce evidence of his state of mind, thereby potentially inducing him to rely on a defense he may not otherwise have

7

asserted. But, the following admitted statement was of a similar nature: "yeah, I fucking killed my wife…it pissed me off because I had to chase her to finish it." Additionally, there was testimony that Appellant thought about not killing the victim, but that she had lied to him. While the statement should have been turned over to Appellant when the Commonwealth discovered it, there is no justification for setting aside his conviction unless there is a "reasonable possibility that it affected the verdict." Emerson v. Commonwealth, 230 S.W.3d 563, 570 (Ky. 2007).

There is no evidence to indicate that this particular statement had any impact on the conviction given the other statements and testimony regarding Appellant's state of mind. Appellant was also able to address any perceived prejudice to his case by cross-examining Officer Galvan and Detective Finch. Therefore, any error in the Commonwealth's failure to disclose the statement is harmless under RCr 9.24.

### C. Requested Wanton Endangerment Instruction

Appellant argues that he should have received an instruction on first-degree wanton endangerment with respect to the four counts of criminal attempt murder on the police officers. KRS 501.020(3) defines a person as acting wantonly "with respect to a result or circumstance described by the statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would

8

observe in the situation." Appellant claims he was entitled to the instruction because there were witnesses who saw him shooting in the air.

In criminal cases, the trial court must present "instructions applicable to every state of the case deducible or supported to any extent by the testimony." Manning v. Commonwealth, 23 S.W.3d 610 (Ky. 2000). It is clear in this case that the evidence did not support an instruction for wanton endangerment.

Appellant explicitly told Officer Lee that he was going to shoot her in the head and also yelled for the officers to come out and that he would get them too. Additionally, Detective Smithers heard and felt shots around his head and feet as he was approaching the house and Officer Blake said once he made it to the truck, there were no more gun shots. Perhaps Appellant could also have been charged with wanton endangerment for some random shots, but he was not. The totality of the evidence demonstrates that Appellant's shots were intentional and purposeful. No wanton endangerment instruction was warranted and there was no error.

### D. Admission of Weapons and Ammunition

Appellant did not object to the introduction of the following weapons and ammunition collected at the scene: a Smith and Wesson 357 Magnum revolver found under a tree in the front yard (identified as consistent with the weapon used to shoot the victim), and a pistol and a revolver (both found in the kitchen and consistent with spent shell casings and live rounds around the house). He did, however, object to the introduction of ammunition and guns not used in the crimes, namely: a box of 50 Remington high-velocity .22 long rifle hollow point live rounds collected from the rear floorboard of his truck and fifty-five weapons,

9

ammunition, and weapon accessories collected from two gun cabinets, two gun safes, a bedroom closet and a basement laundry room closet. Appellant claims this evidence was not relevant, that there was no connection between these weapons and the crimes, that not all of the weapons were his, and that the Commonwealth was only introducing them to prejudicially portray him as a gun fanatic.

The Commonwealth responded that the weapons and ammunition were relevant to show that Appellant had clear knowledge about weapons and their use and that the presence of them lent credence to their theory that his actions were purposeful.

Appellant relies on a line of cases that have held inadmissible guns not related to the crime or which cannot be authenticated as those related to a crime. Major v. Commonwealth, 177 S.W.3d 700 (Ky. 2006); Gerlaugh v. Commonwealth, 156 S.W.3d 747 (Ky. 2005). In Major, several guns completely unrelated to a murder were introduced. In Gerlaugh, a gun was introduced into evidence as the one used in a robbery with no evidence, direct or indirect, identifying the weapon. The basic rule embodied by these cases is that it is "error to introduce . . . weapons without [a] connection to the crime." Major, 177 S.W.3d at 711. This does not mean, as Appellant urges, that guns are only admissible at a trial if they were used in the crime.

The facts as they actually happened distinguish this case from Major and Gerlaugh. Appellant left the house where he shot his wife and drove immediately to his own home where the small arsenal of weapons and ammunition was stored. Once he arrived there, he ordered his family to leave the house, telling

10

them that the police were coming because he had just killed Paula. The presence of the extra guns there, especially in combination with the statements made to family members at the time, helps show that he went to the house with the intention, or at least the ability, to engage in the ensuing shootout and standoff with officers. In this way, the guns were also relevant to show Appellant's state of mind with regard to the attempted murder of the police officers. (Though the merits of the issue are not addressed above, the fact that Appellant drove to a house with a large number of guns also undercuts any claim that he was suffering under EED when he attacked the police.) Also, there was no question that the weapons introduced at trial were actually the ones found at the house where the Appellant fired at the police and engaged in a standoff. Thus, the extra guns in this case were relevant, their probativeness was not significantly outweighed by their prejudicial effect, and they were properly admitted into evidence.

### III. Conclusion

For the reasons set forth herein, the judgment and sentence of the Jefferson Circuit Court is affirmed.

Lambert, C.J.; Abramson, Cunningham, Minton, Noble and Scott, JJ., concur. Schroder, J., concurs in result only.

COUNSEL FOR APPELLANT:

Daniel T. Goyette
Louisville Metro Public Defender
200 Advocacy Plaza
719 West Jefferson Street
Louisville, Kentucky 40202

Cicely Jaracz Lambert
Deputy Appellate Defender
Louisville Metro Public Defender
200 Advocacy Plaza
719 West Jefferson Street
Louisville, Kentucky 40202


COUNSEL FOR APPELLEE:

Jack Conway
Attorney General

Gregory C. Fuchs
Assistant Attorney General
Office of Attorney General
Criminal Appellate Division
1024 Capital Center Drive
Frankfort, Kentucky 40601-8204