William Alexander MAJOR, Appellant,

v.

COMMONWEALTH of Kentucky, Appellee.

No. 2003–SC–673–MR.

Supreme Court of Kentucky.

Sept. 22, 2005.

Rehearing Denied Dec. 22, 2005.

As Corrected Feb. 3, 2006.

Donna L. Boyce, Damon L. Preston, Department of Public Advocacy, Frankfort, Counsel for Appellant.

George G. Seelig, Assistant Attorney General, Office of the Attorney General, Gregory D. Stumbo, Attorney General, Frankfort, Counsel for Apellee.

Opinion of the Court by Justice SCOTT.

The Appellant, William Alexander Major, was convicted of murder and tampering with physical evidence by the Boone Circuit Court and sentenced to a term of life in prison. He appeals to this Court as a matter of right, Ky. Const. § 110(2)(b), asserting the following claims of error; (1) Admission of uncharged acts in violation of KRE 404 and 403; (2) failure to grant a mistrial upon the mention of a polygraph test; (3) failure to suppress a taped phone conversation between the Appellant and his father; (4) admission of a firearm not proven to be connected with the crime; (5) prejudicial conduct (crying) of the prosecutor during the trial and (6) the failure to grant a mistrial due to a conversation between the Court Bailiff and a juror.

For reasons hereinafter set out, we reverse the Appellant's conviction and remand this case to the trial court for a new trial because of (1) the improper admission of evidence of uncharged crimes and (2) the admission into evidence of firearms unconnected to the crime charged. Having reversed, we will address those additional claims of error that are likely to reoccur upon retrial. *Springer v. Commonwealth,* 998 S.W.2d 439, 445 (Ky.1999).

## FACTS

The Appellant, William Major, and his wife, Marlene Major, had two (2) children, a son, Donald Oakes, and a daughter, Lalona Bramble. By the fall of 1980 however, their marriage was failing. On the night of October 11, 1980, Marlene disappeared.

On November 29, 1981, a skull of a white female was found on a nearby farm belonging to the Waller family. Appellant worked there on occasions. Later DNA testing,[1] in 2001, confirmed the skull belonged to a maternal relative of their daughter, Lalona Bramble.

According to information contained in Marlene's diary, she had witnessed Appellant sexually molesting their son, Donald. On the day of her disappearance, she told her sister she had "proof" against the Appellant kept some place where he would not find it, and if anything happened to her, the information would go to the police. In the same conversations, she told her sister about her unhappiness and that she was going to divorce the Appellant. She spoke one more time with her sister that night, and seemed to be upset as a result of fighting that was occurring in her home.

Glen St. Hillaire lived on their property near the Appellant and Marlene. He was friends with both and worked with the Appellant in his garage. Apparently he and Marlene were also romantically involved. In fact, Marlene had given St. Hillaire her diaries for safekeeping after an argument with the Appellant.

At times when they were estranged due to arguments, the Appellant would describe to others what he would do if Mar-

---

1. Testing bone material for DNA did not become common practice until about 1996.

lene ever left him. On several occasions, he even told St. Hillaire he would shoot Marlene, cut her head off and knock her teeth out, in order to make identification of her body difficult. Similar threats to dismember her body were made by Appellant in the presence of others.

On the night of October 11, 1980, St. Hillaire became concerned. He saw Appellant around the trailer around 3:00 a.m. and asked about Marlene and the kids. Appellant told him he didn't know where she was, but she had left with the children. However, it appears Appellant had taken the children over to a neighbor's house around 11:00 p.m. and told them that Marlene had left him for St. Hillaire.

Over the next several days, Appellant sold his holdings in Kentucky in preparation for moving to Rhode Island. He gave his three (3) weapons to his neighbor, Brice—a 9mm pistol, a shotgun and a 22 caliber rifle and also sold him his tractor. On Wednesday of that week, he notified the Boone County Sheriff's office that Marlene was missing, claiming they had an argument and she left him. Subsequently, St. Hillaire notified the police of his concerns and ultimately they took possession of Marlene's diaries and the weapons Appellant had given Brice. Their investigations in the general vicinity did not turn up her body.

Sometime later the detectives traveled to Rhode Island to speak with Appellant's son, Donald, concerning the allegations of sexual abuse that occurred in Kentucky. Although they were unsuccessful in acquiring any useful information at the time, the Appellant beat Donald when he found out about the inquiries, accusing him of giving the police information.

After the Appellant moved to Rhode Island with the children, the sexual abuse of Donald continued. Moreover, Appellant then began to sexually abuse Lalona. Ul-

timately he was discovered, convicted and incarcerated in Rhode Island for the sexual abuse of the children. He was incarcerated there for approximately ten (10) years, up until sometime in 1996. Thereafter, he was transported back to Kentucky on a detainer which had been issued against him in regard to the prior sexual abuse of Donald when they lived in Kentucky. It was during this incarceration, in 1996, on the detainer, from Boone County, when he made the telephone call and confession to his father, Mr. James Major.

Later in early 2001, the detectives became aware of this 1996 phone conversation the Appellant had with his father, wherein, he apparently confessed to Mr. Major that he had killed Marlene. Thereafter, the detectives went to Nova Scotia in an attempt to set up another phone conversation between Mr. Major and the Appellant, hoping the Appellant would acknowledge the confession. Mr. Major was cooperative in this, even suggesting his cover story would be he only had a short time to live. The call was made and it was taped by the detectives, however Appellant's answers were evasive, such as, "Why do I get the feeling that somebody is trying to set me up?" When asked if he could say what happened, Appellant replied: "Even if I could, I probably wouldn't." When Mr. Major told him his daughter just wanted to know what happened, Appellant said to tell her to "ask Marlene's boyfriend in Indiana ... I think if they had a talk with him ... they might be surprised." When Mr. Major reminded Appellant "You told me you killed her." He replied: "At the time I was in jail and I was pretty well upset." At the time of this conversation, the Appellant was not under arrest; nor was he incarcerated.

Ultimately, around July of 2001, the Appellant was charged and extradited back to Kentucky. Once in custody, he immediately began to ask questions about the

investigation. He was advised of his Miranda rights and responded he understood them. He then made a series of incriminating statements. Back in Kentucky, he met with Detective Jack Banks and was re-Mirandized, and thereafter gave the officers his version of the events that took place on the night of Marlene Major's death.

According to Appellant, they got into an argument in her Ford Pinto, when she pulled a gun on him. He took it away from her and she began screaming, then as Appellant related it, he "lost it" and fired the gun until it was empty. After realizing he had killed her, he left her body in the Pinto and took the children to spend the night at his neighbors, Trinnie Brice's house. He then returned and took Marlene's Pinto to the Waller Farm where he dumped her body in a sink hole, covered it with dirt and a piece of rolled fencing, and then tossed the murder weapon in a nearby pond. He even drew the police a map to aid in their search for her remains. As to her Ford Pinto, he indicated he had pushed it into the Ohio River near a ferry.

Significantly, neither Marlene's body (other than the skull), the Ford Pinto, nor the pistol were ever located or recovered.

## I. UNCHARGED ACTS

The Appellant argues the Court committed reversible error by allowing the Commonwealth to introduce highly inflammatory character evidence of Appellant's sexual and physical abuse of his children, of his past marriages, a child abandonment, and of his prior incarceration for the sexual abuse of his children; all of which unduly prejudiced the jury against him and were unrelated to the charged crime of murder.

### A. TESTIMONY OF SEXUAL ABUSE BY CHILDREN

The Appellant's son, Donald Oakes, testified about Appellant's sexual abuse of him, both in Kentucky and Rhode Island, prior to, and after, the alleged murder of his mother, Marlene Major. In fact, Marlene had caught Appellant sexually abusing him and had confronted Appellant about it, indicating she was going to divorce him. This event was noted in her diary, which she intimated to others would turn up if anything happened to her. It did.

Oakes also testified about arguments he witnessed between his parents over his sexual abuse by the Appellant and about being beaten by Appellant after he had been questioned about the sexual abuse by the Kentucky police in Rhode Island, the Appellant having accused Oakes of giving information about him to the police.

His daughter, Lalona Bramble, was allowed to describe in detail the sexual abuse she also suffered, a death threat made to her by her father, as well as her father's arrest in Rhode Island on the charges of sexual abuse that occurred in Rhode Island. However, the sexual abuse of the daughter, Lalona, did not begin until sometime after Marlene's disappearance, after Appellant and the children had relocated to Rhode Island.

Accepting the Commonwealth's arguments that this evidence was admissible, not only to prove motive, but for reasons it was so "inextricably intertwined" with other essential evidence, the trial court denied the Appellant's motions and objections to its entry into evidence.

 Relevant evidence which is probative of an element of the charged crime is admissible, even though the evidence may also prove commission of other crimes. *Sanders v. Commonwealth*, 801 S.W.2d 665 (Ky.1990). Yet, the question of whether the probative value of the evi-

dence outweighs the prejudicial effect is within the discretion of the trial court. *Rake v. Commonwealth,* 450 S.W.2d 527 (Ky.1970). And lastly, the trial court's determination as to the balance is subject to review under an abuse of discretion standard. *Johnson v. Commonwealth,* 105 S.W.3d 430 (Ky.2003). Although the judge has discretion in balancing the probative value as against the danger of prejudice, the judge must apply KRE 404 cautiously and eliminate evidence which is relevant only as proof of a defendant's propensity to commit a certain type of crime. *Commonwealth v. English,* 993 S.W.2d 941, 945 (Ky.1999) and *Daniel v. Commonwealth,* 905 S.W.2d 76 (Ky.1995).

██ Indeed, in reviewing the trial judge's balancing under KRE 403, the appellate court must view the evidence in the light most favorable to its proponent, giving the evidence its maximum reasonable probative force and its minimum reasonable prejudicial value. *Turpin v. Kassulke,* 26 F.3d 1392, 1399, 1400 (6th Cir. 1994). Although evidence is not admissible to show a "lustful inclination," *Pendleton v. Commonwealth,* 685 S.W.2d 549, 552 (Ky.1985), we have noted the same evidence may be admissible for other reasons, including motive. *Price v. Commonwealth,* 31 S.W.3d 885, 888 (Ky.2000); KRE 404(b)(1) and (2).

██ Having considered the above evidence within the context of its presentation, the testimony of Donald Oakes, as to his sexual abuse by the Appellant, both prior to, and after the disappearance of Marlene Major, was appropriate and admissible under KRE 404(b)(1) as proof of "motive." *Price, supra.* His testimony about Appellant beating him after his interview by the police officers is evidence which we have recognized as "an expression of a sense of guilt." *Rodriguez v. Commonwealth,* 107 S.W.3d 215, 219, 220

(Ky.2003). The jury could well believe the beating was designed to cover up evidence of Appellant's guilt or to prevent further disclosures.

██ However, the testimony of the daughter, Lalona Bramble, as to her sexual abuse, though terrible, had no relevance to the issues involved in the murder; nor could it be said to be so "inextricably intertwined" with the other evidence as to have necessarily been admissible. "The key to understanding this exception is the word inextricably. The exception relates only to evidence that must come in because it is so interwoven with the evidence of the crime charged that its introduction is unavoidable." *Funk v. Commonwealth,* 842 S.W.2d 476, 480 (Ky.1993).

The abuse of Lalona Bramble did not occur until after the disappearance of Marlene Major and then, only sometime after they relocated to Rhode Island. There is simply nothing in the evidence from which we could conclude Lalona's abuse was in anyway tied to the motive for the murder of Marlene. Nor does it supply, or support, any other reasonably related issue.

In *Price, supra,* we held testimony of the sexual assault shortly after the murder, admissible. But there was implicit evidence tying the sexual abuse in as a motive for the murder and the sexual abuse had also pre-existed the murder. Here it's simply a matter of logic. Marlene knew of Donald's abuse by the Appellant and had even recorded it in her diary and threatened to leave Appellant over it. As in *Price,* one could argue Appellant's lust for the son was, at least in part, the reason for her murder; or that otherwise, she was killed since she had threatened to, or might, disclose it. One theory (motive) makes the continuation of his abuse in Rhode Island relevant in support of this notion. KRE 404(b)(1). Proof of its con-

tinuation in Rhode Island is important so as to show its significance to Appellant—its absence would have made the theory less likely—its continuation made it more likely. KRE 401.

However, the fact of Donald's abuse (does not, by itself) make Lalona's later abuse in Rhode Island relevant under KRE 404(b)(1) and (2), since there is no evidence we can discern, even implicit, that it played a part in the dynamics of any confrontation between Appellant and Marlene at least from Marlene's state of mind (It had not happened yet). And there was no evidence from which it could be reasonably argued Donald's abuse played any part in Appellant's state of mind. As to Lalona, it was an unconnected crime for which he served ten years.

Thus, the introduction of evidence of the subsequent abuse of Lalona Bramble, occurring only after the family moved to Rhode Island, was an abuse of discretion, erroneous and prejudicial.

## B. *THE EVIDENCE OF THE APPELLANT'S PAST MARRIAGES, CHILD ABANDONMENT AND HIS PRIOR INCARCERATIONS*

Jim Major, Appellant's father testified at trial via video deposition. During his testimony, he made several references to Appellant's prior incarcerations. When asked if Appellant had graduated from high school, he responded he had gotten his GED in prison. He also stated that Pauline (Appellant's wife in Rhode Island) divorced Appellant while he was in jail. Mr. Major also volunteered that Appellant had a child by a young woman that he did not marry and left the woman to raise the child by herself on welfare. He then detailed each of the Appellant's prior marriages and testified to the fact that Appellant had most recently married a pen pal he had while in prison. The Common-

wealth even questioned Mr. Major about his knowledge of Appellant's arrest for sexual offenses in Rhode Island in 1985, whereupon he replied, Appellant was "given 15 (years), but got out in 10 for good behavior." He testified he never visited Appellant in prison, but had disowned him upon his arrest.

Following his release from prison in Rhode Island in 1996, the Appellant was sent back to Kentucky on a detainer issued from this state on charges relating to the molestation of his son, Donald, in Kentucky. It was during this incarceration when he called his father and allegedly confessed to the murder of Marlene.

KRE 404(b)(2) is "intended to be flexible enough to permit the prosecution to present a complete, un-fragmented, un-artificial picture of the crime committed by the defendant, including necessary context, background and perspective." *Norton v. Commonwealth*, 890 S.W.2d 632, 638 (Ky. App.1994).

Thus, the evidence of his incarceration in Kentucky in response to the detainer issued to Rhode Island provides the setting and context within which he called and confessed to his father of the murder of Marlene. The fact of the incarceration, and the time of incarceration, in Rhode Island is relevant and admissible as explaining the delay in the Appellant being brought back to Kentucky and necessarily explains the context within, and time in which, the investigation occurred, and, upon a retrial, the conviction itself could be relevant to the continuing sexual abuse of Donald Oakes if such abuse is denied. However, as there should be no issues at trial involving the subsequent sexual abuse of Lalona Bramble, the conviction and incarceration in Rhode Island should not be used in such a way as to be connected to her.

■ On the other hand, the testimony relating to the Appellant's previous and subsequent marriages, including the abandonment of his child by another woman, are totally irrelevant to the issues involved in this case, prejudicial and should not reoccur at retrial.

## II. *MENTION OF THE POLYGRAPH TEST*

■ During his testimony, the Commonwealth questioned Florence Police Officer, Bruce Graham, about his contact with the Appellant in the week following Marlene's disappearance. Graham testified he went out to the Waller Farm to talk with the Appellant; advised the Appellant that he was still looking for Marlene and "asked him if he would be willing to take a polygraph test." Upon immediate objection by Appellant's counsel, no further evidence was elicited indicating whether Appellant accepted or refused the test or did, or did not, take it. At the bench conference the court refused to grant a mistrial, instead offering the defense an admonition, which was refused. Following the bench conference, the prosecution pursued an entirely different line of questioning with the witness and no further reference was made to this issue. Obviously, from the context, the comment as to the polygraph was inadvertent.

In *Morgan v. Commonwealth*, 809 S.W.2d 704 (Ky.1991), we held the disclosure to the jury that an intense interrogation had taken place in a room containing a polygraph "amounted to a virtual banner headline that Appellant had been given a polygraph examination." *Id.* at 706. In *Ice v. Commonwealth*, 667 S.W.2d 671 (Ky. 1984), we held the mere mention of the taking of a polygraph examination was error. Here, however, we have an inadvertent statement of the offer, in a context that did not necessarily suggest a polygraph was taken and for which the court offered an admonition, which was refused.

■ In order for a trial judge to grant a mistrial the record must reveal a manifest necessity for such an action or an urgent or real necessity. *Skaggs v. Commonwealth*, 694 S.W.2d 672, 678 (Ky. 1985). This test permits a balancing of the competing interests present whenever a Motion for Mistrial is advanced. . . . It is universally agreed that a mistrial is an extreme remedy and should be resorted to only when there is a fundamental defect in the proceedings which will result in a manifest injustice. The occurrence complained of must be of such character and magnitude that a litigant will be denied a fair and impartial trial and the prejudicial effect can be removed in no other way. *Gould v. Charlton Company Inc.*, 929 S.W.2d 734, 737–38 (Ky.1996).

In light of the circumstances which occurred and the competing interests mentioned in *Gould,* the trial judge made the right decision. There was no manifest necessity requiring the granting of a mistrial for this inadvertent comment in the context within which it occurred and it was not an abuse of discretion for the court to so hold. Obviously it will not reoccur.

## III. *ADMISSIBILITY OF THE TAPED PHONE CONVERSATION BETWEEN THE APPELLANT AND HIS FATHER, JAMES MAJOR*

In 1996, while in the Boone County Jail, the Appellant called his father, James Major, and during the conversation, admitted to murdering Marlene Major. By late February, or March 2001, Detective Kinner had become aware of the 1996 phone conversation and he and Detective Tim Camahan traveled to Mr. Major's residence in Nova Scotia for the purpose of attempting to tape an additional telephone conversation between Mr. Major and the

Appellant. Mr. Major was cooperative in this and made the phone call, which was taped. However Appellant's answers were evasive. When asked if he could tell Mr. Major what happened, the Appellant replied, "even if I could, I probably wouldn't." When Mr. Major told Appellant his daughter just wanted to know what happened, the Appellant suggested Mr. Major tell her to "ask Marlene's boyfriend in Indiana ... I think if they had a talk with him ... they might be surprised" and when his father told Appellant you told me "you killed her," the Appellant responded "at the time I was in jail and I was pretty well upset ... why do I get the feeling that somebody is trying to set me up?"

Before trial, Appellant filed a Motion to Suppress the taped conversation, alleging violations of his Fourth, Fifth and Sixth Amendment rights under the United States Constitution and Sections 2, 10 and 11 of the Bill of Rights of the Kentucky Constitution. This motion was denied.

■ Appellant has not shown that any constitutionally violative procedures were used in securing the audio tape of the phone conversation. Since official proceedings had not been instituted against the Appellant for the murder of Marlene at the time of the taping, and he was not incarcerated, it was not in violation of the Appellant's Fifth or Sixth Amendments rights. Moreover, even though the phone conversation took place from James Major's residence in Nova Scotia to the Appellant's residence, then in Massachusetts, the activity was appropriate under Kentucky Criminal Law, KRS 526.010; thus not in violation of his Fourth Amendment rights. The practice of recording conversations with the consent of at least one party to the conversation has long been

recognized in Kentucky jurisprudence. *Carrier v. Commonwealth,* 607 S.W.2d 115 (Ky.App.1980); *See also, Lopez v. U.S.,* 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963)[2].

■ Rulings on the admissibility of evidence by the trial court are not disturbed on review in the absence of an abuse in discretion. *Commonwealth v. English,* 993 S.W.2d 941 (Ky.1999); *Jarvis v. Commonwealth,* 960 S.W.2d 466 (Ky.1998); *Partin v. Commonwealth,* 918 S.W.2d 219 (Ky.1996). There being no illegal government activity here, the contents of this taped conversation were properly admitted into evidence.

## IV. *ADMISSION OF FIREARMS UNRELATED TO THE CRIME*

The Appellant next contends that the trial court erred in permitting the Commonwealth to introduce the handgun, shotgun and rifle owned by the Appellant in October of 1980, absent evidence that any of the firearms were involved in the murder of Marlene.

■ We have upheld the admission of weapons into evidence based upon testimony that the weapon was the one used in the commission of the offense, *Beason v. Commonwealth,* 548 S.W.2d 835 (Ky.1977), or that it was of the same size and shape as the weapon used in the commission of the offense, *Sweatt v. Commonwealth,* 550 S.W.2d 520 (Ky.1977); or that it was found at the scene of the offense and was capable of inflicting the type of injury sustained by the victim, *Barth v. Commonwealth,* 80 S.W.3d 390 (Ky.2001). However, weapons, which have no relation to the crime, are inadmissible. *Gerlaugh v. Common-*

---

**2.** In *Demoulas v. Demoulas Supermarkets, Inc.,* 432 Mass. 43, 732 N.E.2d 875 (2000), a similar case involving a phone call from Nova Scotia to Massachusetts was approved.

*wealth,* 156 S.W.3d 747 (Ky.2005). Thus, it was error to introduce these weapons without connection to the crime.

## V. THE COMMONWEALTH'S ATTORNEY COMMITTED PREJUDICIAL ERROR BY CRYING IN FRONT OF THE JURY

■ Being unpreserved, the Appellant requests the Court to review the Commonwealth's Attorney's alleged misconduct in crying before the jury as palpable error under RCr 10.26. At two points during the trial, brief episodes of emotionality overcame the prosecuting attorney. Once while examining the Appellant's son, Donald Oakes, the witness became emotional in describing what he remembered of his deceased mother. This briefly caused the prosecutor to respond similarly. Again during the sentencing phase argument, the prosecutor recalled how the victim's children remembered their mother, which again brought about a brief quaver to her voice. No objection was made at either time.

■ Trials are conducted by humans, who often show indignation, anger or sadness. This does not mean that real emotion is misconduct. The criteria by which to judge statements and actions during closing argument is whether or not the act is inflammatory, substantially prejudiced the defense, or violated the Appellant's constitutional rights. *Byrd v. Commonwealth,* 825 S.W.2d 272 (Ky.1992). We do not find that it did. Moreover, such conduct does not qualify as palpable error.

## VI. CONVERSATIONS BETWEEN A JUROR AND THE BAILIFF

Following the first witness for the Commonwealth, the judge reported to counsel that one of the jurors had asked the bailiff "why are we having this trial? The Grand Jury indicted him." The trial judge then called the jurors to the bench and explained to the jurors that the Grand Jury is a secret process where the burden of proof is less, that the indictment is not to be considered as evidence, and that the Grand Jury process is just an initiating step to start the trial process. The juror then commented that he just wanted that position clarified, and then was allowed to return to the panel. The trial judge denied Appellant's Motion for Mistrial and gave an admonition to the entire jury, whereupon he explained that an indictment is not to be considered as evidence and that it is just a vehicle to start the trial process. The judge further explained that a different standard of proof is used between the Grand Jury and the trial and that certain information had to be heard by the Grand Jury, but the case had not been tried before the Grand Jury.

■ Kentucky Law provides that "no officer, party, or witness to an action pending, or his attorney, or attorneys shall, without leave of court, converse with the jury or any member thereof upon any subject after they have been sworn." KRS § 29A.310(2). However, not every incident of juror misconduct requires a new trial. The test is whether the misconduct has prejudiced the Defendant to the extent that he has not received a fair trial. *United States v. Klee,* 494 F.2d 394 (9th Cir.1974). The trial judge has discretion in determining the prejudicial effect of a juror's misconduct, particularly if there is an opportunity to give a curative admonition. *Polk v. Commonwealth,* 574 S.W.2d 335 (Ky.App.1978). A Defendant's Motion for Mistrial should only be granted where there is a "manifest necessity for such an action or an urgent or real necessity." *Skaggs v. Commonwealth, supra.* It is incumbent upon the party claiming bias or impartiality to prove the point. *Polk* at 337.

Weighing the information before the Court, plus the assumption that an admonition would be followed by the jury, the trial court properly concluded that the admonition was sufficient and the case should go forward. This one question by one juror did not deprive the Appellant of a fair trial, and in light of all the competing elements that were present, at that point and time the Appellant failed to show the trial judge abused his discretion in denying the Motion for Mistrial. There was simply no error here.

Having found error under issues I(A) and (B) and IV, we are convinced the cumulative effect of the prejudice from all three mandates a new trial. *Funk v. Commonwealth*, 842 S.W.2d 476, 483 (Ky.1993). Therefore, the Judgment of Conviction and the sentence imposed therefore are reversed and this case is remanded to the Boone Circuit Court for a new trial in accordance with this Opinion.

LAMBERT, C.J., joins this opinion.

COOPER, J., concurs in part and dissents in part by separate opinion with JOHNSTONE, J., joining that opinion.

ROACH, J., dissents by separate opinion with GRAVES and WINTERSHEIMER, JJ., joining that opinion.

WINTERSHEIMER, J., dissents by separate opinion.

COOPER, Justice, concurring in part and dissenting in part.

I concur with the majority opinion's conclusion that this case must be remanded for a new trial, primarily because of the admission of "prior bad acts" evidence relating to Appellant's sexual abuse of his daughter, L.B., admission of evidence of his previous and subsequent marriages and that he abandoned his child conceived by another relationship, and admission of firearms that were unrelated to the crime. However, I disagree with the majority opinion with respect to a few issues that are likely to recur upon retrial.

## I. EVIDENCE OF BEATING.

This is a sub-issue of the "prior bad acts" issue regarding Appellant's sexual abuse of his son, D.O. I agree with the majority opinion that evidence of the sexual abuse of D.O. is admissible to prove Appellant's motive for killing his wife, because she knew of the sexual abuse and had threatened to report it to the police. The sub-issue on which I dissent concerns admission of evidence that after the police interviewed D.O. about the sexual abuse, Appellant administered a beating to D.O. The majority opinion holds that this evidence is admissible under KRE 404(b)(1) for the "other purpose" of showing a "sense of guilt." *Ante,* at 707.

We have held that evidence of flight by a defendant from the scene of a crime or from arresting officers, as well as evidence of a defendant's efforts to bribe a juror or witness, or to fabricate evidence, is admissible to show a sense or consciousness of guilt.

> If one accused of crime flees, or attempts to bribe a witness, or a juror, or to fabricate evidence, all such conduct is receivable as evidence of his guilt of the main fact charged. It is in the nature of an admission; for it is not to be supposed that one who is innocent and conscious of the fact would flee, or would feel the necessity for fabricating evidence.

*Turpin v. Commonwealth,* 140 Ky. 294, 130 S.W. 1086, 1087 (1910) (attempted bribery of juror). *See also Rodriguez v. Commonwealth,* 107 S.W.3d 215, 219–20 (Ky.2003) (flight); *Adkins v. Commonwealth,* 96 S.W.3d 779, 793 (Ky.2003) (giv-

ing false name and address to arresting officer); *Tamme v. Commonwealth*, 973 S.W.2d 13, 29–31 (Ky.1998) (subornation of perjury); *Foley v. Commonwealth*, 942 S.W.2d 876, 887 (Ky.1996) ("Any attempt to suppress a witness' testimony by the accused, whether by persuasion, bribery, or threat, or to induce a witness not to appear at the trial or to swear falsely, or to interfere with the processes of the court is evidence tending to show guilt."); *Collier v. Commonwealth*, 339 S.W.2d 167, 168 (Ky.1960) (threat to kill complaining witness if she did not take action to have charges dismissed); *Davis v. Commonwealth*, 204 Ky. 601, 265 S.W. 10, 11 (1924) (attempted bribery of witness); *Wilhite v. Commonwealth*, 203 Ky. 543, 262 S.W. 949, 950 (1924) (threat to kill witness and attempt to carry out threat after the witness testified before grand jury). In each of those cases, the evidence directly related to an attempt to avoid judicial proceedings or to spoliate evidence relating to the charged offense.

Evidence that Appellant administered a beating to D.O. after D.O.'s interview with the police does not tend to show an attempt to avoid judicial proceedings or to spoliate evidence relating to the charged offense. In the first place, the charged offense was the murder of Appellant's wife, not the sexual abuse of D.O. In the second place, the evidence only ambiguously tends to show a consciousness of guilt of sexual abuse. The majority opinion assumes that Appellant beat D.O. as punishment for telling the truth or to discourage further disclosures, whereas Appellant could just as well have beaten D.O as punishment for telling a lie. Regardless, I find no authority for the proposition that a "prior bad act" can be admitted as circumstantial proof of another "prior bad act" that is admitted solely as circumstantial proof of a motive to commit the charged offense. The evidence more nearly proves

by a specific instance of conduct that Appellant was a man of violent character who was likely to have killed his wife in a fit of rage. So viewed, the evidence is inadmissible under KRE 404(a) and 405(a), and I would direct the trial court to exclude it at retrial.

## II. EVIDENCE OF PAST IMPRISONMENTS.

The Commonwealth introduced this evidence through the testimony of Appellant's estranged father, James Major, who was permitted to testify that Appellant had obtained his GED (General Educational Development) diploma while in prison, that one of Appellant's wives divorced him while he was in prison, that Appellant had married a pen pal with whom he corresponded while in prison, and that Appellant was sentenced to fifteen years for sexually abusing his children "but got out in ten for good behavior." James Major also testified that while incarcerated in Kentucky on charges of molesting D.O., Appellant called him on the telephone and confessed to the murder of his wife. The majority opinion holds that all of this evidence of multiple imprisonments was admissible "as explaining the delay in the Appellant being brought back to Kentucky...." *Ante,* at 708. I disagree.

Evidence is relevant if it has "any tendency to make the existence of any fact *that is of consequence to the determination of the action* more probable or less probable than it would be without the evidence." KRE 401 (emphasis added). As explained by Professor Lawson, KRE 401 incorporates the concepts of both relevance and materiality. Relevance is embodied in the language "any tendency to make the existence of any fact ... more probable or less probable...." Materiality is embodied in the language "that is of consequence to the determination of the

action." Robert G. Lawson, *The Kentucky Evidence Law Handbook* § 2.05[2], at 78–79 (4th ed. LexisNexis 2003).

A consequential or material fact is ascertained under ... substantive law by determining whether it is "in issue" in the sense that it is within the range of litigated matters in controversy. It need not be an element of a crime or cause of action or defense but it must, at least, be in issue.... If the evidence is offered to prove a fact not in issue under substantive law then, while it might be probative of that fact, it is nonetheless not relevant under Rule 401.

*Id.* § 2.05[3], at 81 (quoting 2 *Weinstein's Federal Evidence* § 401.04[3][b] (2d ed. 2002)). However:

The fact to which the evidence is directed need not be in dispute.... Evidence which is essentially background in nature can scarcely be said to involve disputed matter, yet it is universally offered and admitted as an aid to understanding. Charts, photographs, views of real estate, murder weapons, and many other items of evidence fall into this category. A rule limiting admissibility to evidence directed to a controversial point would invite the exclusion of this helpful evidence, or at least the raising of endless questions over its admission.

*Id.* (quoting Fed.R.Evid. 401, Advisory Committee's Notes).

Neither the fact that Appellant had been previously incarcerated nor the length of his incarceration was a "fact that is of consequence to the determination" of whether he murdered his wife. Nor was it helpful in understanding other relevant evidence. "[E]xplaining the delay in the Appellant being brought back to Kentucky" is a non-issue. Appellant did not confess the murder to his father until 1996, after he had completed his imprisonment in Massachusetts and after he had been extradited

to Kentucky and imprisoned on charges of sexually abusing D.O. in Kentucky. James Major did not tell Kentucky authorities about the confession until 2001, after Appellant had completed service of his Kentucky sentence. Thus, the explanation for the delay was not Appellant's multiple imprisonments but the fact that the police did not learn of his confession until 2001. Of course, the evidence was not only irrelevant; it was also highly prejudicial in that it portrayed Appellant as a life-long criminal. Considering the absence of any probativeness and the extreme prejudicial effect of this evidence, I would hold that its admission was an abuse of discretion and would direct the trial court on remand to exclude it on retrial.

### III. PRIOR CONVICTION.

I agree with the majority opinion that Appellant's prior convictions of sexually abusing D.O. in both Kentucky and Massachusetts would be relevant to prove that Appellant sexually abused D.O. "Evidence offered under the 'other crimes' rules occasionally consists of a judgment of conviction, making it easier to assume that the accused in fact committed the uncharged crime." Lawson, *supra,* § 2.25[3][c], at 130. However, the prosecutor and the trial court should be aware that this Court recently overruled that portion of *Young v. Commonwealth,* 968 S.W.2d 670, 674–75 (Ky.1998), that held that a notarized authentication of a foreign judgment of conviction is sufficient authentication to permit admission of that conviction under KRE 902(8). *Matthews v. Commonwealth,* 163 S.W.3d 11, 26–27 (Ky. 2005).

### IV. STANDARD OF REVIEW.

The majority opinion broadly asserts that "[r]ulings on the admissibility of evidence by the trial court are not disturbed

on review in the absence of an abuse of discretion," citing, *inter alia, Commonwealth v. English*, 993 S.W.2d 941 (1999). *Ante*, at 710. However, *English* only held that "abuse of discretion" is the proper standard of review for a trial court's determination under KRE 403 that the prejudicial effect of evidence does or does not substantially outweigh its probative value. 993 S.W.2d at 945. If all evidence issues were reviewed for abuse of discretion, there would be no need for KRE 104(a), which contemplates that the trial court will make findings of fact with respect to rulings pertaining to, *e.g.*, KRE 404(b) (prior bad acts), KRE 803 (exceptions to the hearsay rule), etc. *See generally Matthews*, 163 S.W.3d at 33–34 (Cooper, J., concurring).

The issues raised with respect to the admission of the 2001 tape-recorded conversation between Appellant and his father were (1) whether, since state action was involved, Appellant should have been advised of his *Miranda* rights prior to making any statements; and (2) whether the recording should have been suppressed because it was obtained in violation of KRS 526.010. The majority opinion correctly concludes that *Miranda* was not implicated because the telephone call did not constitute a custodial interrogation. Appellant was at his home in Massachusetts. The majority opinion also concludes there was no violation of KRS 526.010 (eavesdropping), because at least one participant consented to the recording. In this regard, the trial court's determination that the recording was permissible under KRS 526.010 was supported by the evidence and was thus not clearly erroneous. Nor did the trial court commit clear error in finding that Appellant's statements made during the conversation were admissions as defined in KRE 801A(b)(1). Of course, James Major was in Nova Scotia and Appellant was in Massachusetts when the call

was recorded, so Kentucky law would not determine whether the recording was illegally obtained. Either Nova Scotia or Massachusetts law would determine that issue, and Appellant has not cited the trial court or this Court to any applicable law from either jurisdiction that proves his assertion. Appellant having offered no authority for excluding the recording, the trial court did not err in finding that it was not illegally obtained.

JOHNSTONE, J., joins this opinion.

ROACH, Justice, dissenting.

The majority concludes that cumulative, reversible prejudice resulted from the admission of evidence concerning (i) the sexual abuse of Appellant's daughter, Lalona Bramble, (ii) Appellant's previous marriages and abandonment of his children, and (iii) the introduction of firearms owned by Appellant that were not alleged to have been related to the murder of Appellant's wife, Marlene. Because the majority has refused to properly consider harmless error, I dissent.

To begin with, I am not convinced that the sexual abuse evidence was improperly admitted. After reviewing the trial testimony and proceedings, the evidence at issue appears to be inextricably intertwined with evidence that was rightfully considered. I simply disagree with the majority's conclusion that the abuse of Lalona does not "supply, or support, any other reasonably related issue." *Ante* at 707. The majority finds no error in the admission of sexual abuse evidence relating to Appellant's son, Donald Oakes. At trial, Donald Oakes testified that Appellant subjected him to daily sexual abuse while he lived in Kentucky. He described fights between his mother and father over his father's abusive behavior. Donald also testified that the sexual abuse resumed

shortly after the move to Rhode Island. He testified that he was molested by Appellant "every chance he got." The sexual abuse occurred "morning, evening, whenever." The sexual abuse consisted of fondling, sodomy, and anal penetration. Donald also stated that his father told him that he would kill his sister if he ever told anyone. Ultimately, after years of horrific sexual abuse, Donald's step-mother called the police and Appellant was convicted in Rhode Island of sexual abuse of both Lalona and Donald. The majority states that the sexual abuse of Lalona was "an unconnected crime for which" Appellant served ten years. This is simply inaccurate since Appellant was convicted of sexually abusing *both* his children.

The real issue before this Court, however, is whether harmless error occurred.[1] After reviewing the trial testimony, I can confidently conclude that any error that may have occurred was harmless because the evidence against the Appellant was absolutely overwhelming. In addition to his testimony regarding the abuse, Donald also stated that his father told him that his mother had left the family and that she was a prostitute and drug user. He also said his father questioned him as to whether he saw or heard anything during the last night he saw his mother.

In addition to describing her own sexual abuse at Appellant's hands, Lalona testified that she called her father and asked him what he had done with her mother's body. He replied, "if you ever think I will tell you what I did with her body, you're crazy."

Appellant's father testified that his son confessed to the crime during a telephone conversation. He stated that Appellant told him that he had killed his wife, shooting her six times, and then described how he had disposed of her body.

Appellant also *confessed* to police that he had killed his wife. Detective Kenner testified that Appellant told him at the airport in Providence, Rhode Island, "I know they think I cut her head off—I didn't." On the airplane back to Kentucky, the Appellant told the officers accompanying him that when they got back to Kentucky he would show them in Verona where "[he] dumped her." Appellant also offered the detectives a car and boat to "forget the whole thing."

At the Boone County Jail, Appellant provided additional details of the murder of his wife. He told the officers that a fight ensued because his wife was trying to leave with the couple's children. Appellant then told the police that while his wife was in her Ford Pinto, she took out a revolver. He stated that he grabbed the gun and shot her six times, four times in the body and twice in the head. He remarked that he had been "proud" of his tight grouping of shots and that all six bullet holes were within a ten inch diameter. Appellant then described taking the children to a neighbor's house and dumping his wife's body in a sinkhole at the Waller farm. He also described, in detail, disposing of his wife's car in the Ohio River.

In addition to Appellant's admissions, the majority notes the introduction of the following substantial evidence: (i) a female skull, verified by DNA testing to belong to a maternal relative of Lalona, that had been discovered on the Waller farm just a month after Marlene's disappearance; (ii) testimony that on the day of her disappearance, Appellant's wife told her sister

---

**1.** The admission of Appellant's firearms, though possibly impermissible under *Gerlaugh v. Commonwealth*, 156 S.W.3d 747 (Ky. 2005), is also subject to review for harmless error.

that she had proof of Appellant's abusive behavior and that she was going to divorce him; and (iii) testimony that the Appellant had told others that if his wife ever left him he would shoot her, cut off her head, and knock out her teeth.

In short, the jury heard evidence that the Appellant confessed to both his father and the police that he had murdered his wife. Further, he told his daughter that he would never reveal what he had done with his wife's body, implying his culpability for her disappearance. The jury also heard unchallenged testimony from Donald of the sexual abuse that he was constantly subjected to by Appellant. Evidence of Appellant's guilt is overwhelming. To claim as the majority does that the cumulative effect of the alleged errors mandates a reversal of Appellant's conviction, while failing to even consider the possibility that those errors might be deemed harmless, defies all common sense and logic. Thus, I respectfully dissent.

GRAVES and WINTERSHEIMER, JJ., join this dissenting opinion.

WINTERSHEIMER, Justice, dissenting.

I respectfully dissent from the majority opinion because none of the alleged errors require reversal of this conviction.

The trial judge did not abuse his discretion in allowing the introduction of the evidence of sex abuse because it was admissible to prove motive. The ruling of the trial judge on admissibility, if supported by the evidence, is dispositive of the question. *Cf. Halvorsen v. Commonwealth*, 730 S.W.2d 921 (Ky.1986).

The reference to the polygraph test was arguably inappropriate but it did not prejudice Major. In *Tamme v. Commonwealth*, 973 S.W.2d 13 (Ky.1998), we held that the mere utterance of the word "polygraph" is not grounds for reversal.

The telephone conversation was admissible because the father consented to the taping. It was not error or an abuse of discretion for the trial judge to permit the tape to be introduced. Rulings on the admissibility of evidence by the trial judge should not be disturbed on appellate review in the absence of an abuse of discretion. *Partin v. Commonwealth*, 918 S.W.2d 219 (Ky.1996).

Admission of the firearms previously owned by Major was proper and was really not properly preserved for appellate review. The emotional display on two occasions by the prosecutor at trial was not error and certainly not palpable. The actions of the prosecutor in this situation did not rise to the level of misconduct. The behavior was not inflammatory; it did not substantially prejudice the defendant, nor violate his constitutional rights in any respect. *Cf. Byrd v. Commonwealth*, 825 S.W.2d 272 (Ky.1992).

The admonition by the trial judge to the jury regarding a question by a juror to a bailiff cured any possible error in regard to the statement. There is always a presumption that the jury can follow any curative admonition. *Gould v. Charlton Co., Inc.*, 929 S.W.2d 734 (Ky.1996). The errors alleged here did not cause the trial to be fundamentally unfair to Major and did not violate any of his constitutional rights as protected by the Kentucky or federal constitution.

I would affirm the conviction in all respects.